[S.F. No. 24093. Aug. 28, 1980.]

RICHARD ADAMS HOVEY, Petitioner, v.
THE SUPERIOR COURT OF ALAMEDA COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

4

**COUNSEL**

James C. Hooley, Public Defender, Paul R. Trudell, Assistant Public Defender, Quin Denvir, State Public Defender, Michael G. Millman and Joseph Levine, Deputy State Public Defenders, and Samuel R. Gross for Petitioner.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, Robert R. Granucci and Herbert F. Wilkinson, Deputy Attorneys General, for Real Party in Interest.

Edwin L. Miller, Jr., District Attorney (San Diego), Richard D. Huffman, Chief Deputy District Attorney, and Paul M. Morley, Deputy District Attorney, as Amici Curiae on behalf of Real Party in Interest.

Barry Tarlow as Amicus Curiae.

OPINION

**BIRD, C. J.**—This petition asks this court to decide whether a prospective juror who can be fair and impartial in determining the guilt or innocence of an individual accused of a capital offense may be removed for cause from serving at the *guilt* phase because the juror is unequivocally opposed to the imposition of the death penalty at the *penalty* phase?

I

By an information filed in the Alameda County Superior Court, petitioner, Richard Adams Hovey, stands accused of murder and kidnaping. (Pen. Code, §§ 187, 207.)[1] Two "special circumstances" are alleged in connection with the murder charge.[2] If petitioner is convicted of first degree murder and if the special circumstances allegations are found to be true, the jury will determine whether the sentence is "death or confinement in the state prison for life without possibility of parole...." (Former § 190.2.)

Petitioner brought a pretrial motion to limit the exclusion for cause of prospective jurors to be called to try his case. The thrust of his motion was that the guarantee in the state and federal Constitutions to due process of law and an impartial jury[3] prohibit the trial court from excluding at the *guilt* phase of the trial prospective jurors who would be fair and impartial, but who are unequivocally opposed to imposing the death penalty at the *penalty* phase (should this second phase prove necessary).[4]

---

[1]All references hereinafter to sections are to the Penal Code, unless otherwise indicated.

[2]Former section 190.2, subdivisions (c)(3)(ii) and (c)(3)(iv). Petitioner is accused of having committed the offenses on March 18, 1978. Therefore, he is being tried under the capital punishment laws enacted by the Legislature in 1977. (Stats. 1977, ch. 316.) The enactment in 1978 of Proposition 7 does not affect in any way the conclusions reached herein.

[3]United States Constitution, 6th and 14th Amendments; California Constitution, article I, sections 7, 15, and 16.

[4]As will be discussed (*post*, at pp. 8-10), the exclusionary practice which petitioner challenges is based upon Penal Code section 1074, subdivision 8, as construed by judicial decision (see, e.g., *People v. Riser* (1956) 47 Cal.2d 566, 575-576 [305 P.2d 1]).

Petitioner's pretrial motion also involved a challenge to the in-court *procedures* used

The evidentiary basis for petitioner's motion was developed at an extensive evidentiary hearing held in August and September 1979, in a separate proceeding in the same county. (People v. Kenneth Lynn Moore and David Lee Moore, Alameda Co. Super. Ct. No. 67113.[5]) The Moore brothers' motion covered 17 court days and produced a reporter's transcript of more than 1,200 pages. Seven expert witnesses testified, five for the defense and two for the prosecution. In excess of 1,000 pages of exhibits—primarily sociological studies and graphs and charts—were admitted into evidence, as were several videotapes. By stipulation in the present case, these transcripts and exhibits were introduced at petitioner's motion. No new evidence was presented.

Petitioner's motion to limit exclusions for cause under section 1074, subdivision 8, was denied by the judge who ruled on the Moores' motion. Petitioner sought to invoke the original jurisdiction of this court by filing a petition for writ of mandamus. This court issued an alternative writ based on the importance of the issue presented.[6]

## II

### LEGAL BACKGROUND

■ California statutory law requires that following a challenge for cause, a prospective juror "must neither be permitted nor compelled to serve as a juror" in a capital case if he entertains "such conscientious opinions as would preclude his finding the defendant guilty...." (§ 1074, subd. 8.)[7] Although the literal wording of section 1074, subdivision 8, authorizes removal for cause only when a juror's scruples

---

to identify those prospective jurors whose views on capital punishment justify their exclusion from the trial. This issue is discussed in part VII of this opinion. (*Post*, at pp. 69-81.)

[5]The present petitioner was not a party to the charges filed in the Moore brothers' case.

[6]The pretrial petition is proper. (See *Ganz v. Justice Court* (1969) 273 Cal.App.2d 612, 617-618 [78 Cal.Rptr. 348]; see also *Rubio v. Superior Court* (1979) 24 Cal.3d 93, 97 [154 Cal.Rptr. 734, 593 P.2d 595] (lead opn. of Mosk, J.).)

[7]Section 1074 provides in relevant part: "A challenge for implied bias may be taken for all or any of the following causes, and for no other:

" . . . . . . . . . . . . . . .

"8. If the offense charged be punishable with death, the entertaining of such conscientious opinions as would preclude his finding the defendant guilty; in which case he must neither be permitted nor compelled to serve as a juror."

The quoted language of section 1074 was enacted in 1872 as part of the initial codification of California's penal laws and has remained intact since then.

would have an impact upon the determination of *guilt*, this statute has been judicially construed to require the exclusion of jurors whose views on capital punishment would affect their *penalty* determination alone. (*People* v. *Riser, supra*, 47 Cal.2d at pp. 573-576.) *Riser* was decided in an era when the jury in a death penalty case considered the issues of guilt and punishment simultaneously.[8] However, *Riser*'s interpretation of section 1074, subdivision 8, was reaffirmed after the Legislature set forth a procedure for separate guilty and penalty phases in capital cases. (*People* v. *Gilbert* (1965) 63 Cal.2d 690, 711-712 [47 Cal.Rptr. 909, 408 P.2d 365]; *People* v. *Smith* (1966) 63 Cal.2d 779, 789 [48 Cal.Rptr. 382, 409 P.2d 222].)[9]

Section 1074, subdivision 8, appears to have been given an expansive interpretation in another respect. The statute authorizes the exclusion of jurors whose views "preclude" them from returning verdicts of guilt or death. Prior to 1968 this court held that jurors were properly excused for cause under the statute if they had *any* conscientious scruples against the infliction of the death penalty[10] or if they stated that they "did not believe in capital punishment."[11]

However, this court was not always consistent with respect to this aspect of the statute. For example, in *People* v. *Bandhauer* (1967) 66 Cal.2d 524, 531 [58 Cal.Rptr. 332, 426 P.2d 900], the court indicated that mere "doubts with respect to the death penalty . . . are not sufficient

---

[8]See former section 190, Statutes 1927, chapter 889, section 1, page 1952. In 1957 the Legislature replaced this unitary proceeding with a bifurcated system. (Stats. 1957, ch. 1968, § 2, p. 3509.)

[9]A precise application of the literal words of section 1074, subdivision 8, would, of course, give petitioner the relief he requests and thus would render moot the constitutional challenge to the statute as interpreted in *Riser, Gilbert,* and *Smith.*

However, ever since the Legislature enacted the procedure for bifurcated death penalty trials, it has also provided that "the same jury" which convicted the defendant of first degree murder "shall" determine the penalty to be applied, "unless, for good cause shown, the court discharges that jury in which case a new jury shall be drawn. . . ." (Former § 190.1, Stats. 1957, ch. 1968, § 2, p. 3510; see now § 190.4, subd. (c).) This legislative "preference for one jury qualified to act throughout the entire case" (*People* v. *Gilbert, supra,* 63 Cal.2d at p. 712) would seem to be inconsistent with a literal reading of section 1074, subdivision 8, and thus supports the judicial gloss placed on that section by *Riser* and its progeny.

[10]*People* v. *Hoyt* (1942) 20 Cal.2d 306, 318 [125 P.2d 29]; see also *People* v. *Nicolaus* (1967) 65 Cal.2d 866, 882 [56 Cal.Rptr. 635, 423 P.2d 787].

[11]*People* v. *Duncan* (1960) 53 Cal.2d 803, 816 [3 Cal.Rptr. 351, 350 P.2d 103].

to disqualify a juror so long as he conscientiously believes that he could return a death penalty verdict in a proper case." (See also *People* v. *Riser, supra*, 47 Cal.2d at pp. 575-576 [suggesting that § 1074, subd. 8, compels the exclusion of jurors "incapable" of returning a death verdict]; *People* v. *Rollins* (1919) 179 Cal. 793, 796 [179 P. 209] [the statute excludes jurors who are "so bound by conscientious opinions as to capital punishment that they will be *unable* to act as the circumstances of the case demand in view of the law" (italics added)].)

This apparent conflict was conclusively resolved in June 1968 when the United States Supreme Court issued its landmark decision in *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770]. In *Witherspoon*, a criminal defendant had been convicted of murder and sentenced to die. The prosecutor had removed for cause from the jury which had tried the case all individuals who "[had] conscientious scruples against capital punishment, or...[were] opposed to the same."[12] On appeal, the defendant argued that the jury was unconstitutionally biased in favor of conviction and death.

The Supreme Court reversed Witherspoon's death sentence but upheld his underlying murder conviction. With respect to the penalty imposed, the court held it to be "self-evident"[13] that if a state excuses prospective jurors for cause on the basis of "general objections to the death penalty or...conscientious or religious scruples against its infliction,"[14] then the resulting jury "cannot speak for the community"[15] and is "uncommonly willing to condemn a man to die."[16] This, the court suggested, violates one of the "basic requirements of procedural fairness...[i.e.,] that the decision whether a man deserves to live or die must be made on scales that are not deliberately tipped toward death."[17] (*Id.*, at pp. 521-522, fn. 20 [20 L.Ed.2d at pp. 784-785].) The only prospective jurors who could constitutionally be excused for cause

---

[12]Former Illinois Revised Statutes (1959) chapter 38, section 743, quoted in *Witherspoon* v. *Illinois, supra*, 391 U.S. at page 512 [20 L.Ed.2d at page 779].

[13]391 U.S. at page 518 [20 L.Ed.2d at page 783].

[14]391 U.S. at page 522 [20 L.Ed.2d at page 785], footnote omitted.

[15]391 U.S. at page 520 [20 L.Ed.2d at page 783].

[16]391 U.S. at page 521 [20 L.Ed.2d at page 784].

[17]The precise constitutional basis for this holding is not entirely certain. At one point, the court stated that Witherspoon's jury "fell woefully short of that impartiality to

due to their opposition to or doubts about capital punishment were "those who made unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt.*"[18] (*Id.,* at pp. 522-523, fn. 21 [20 L.Ed.2d at p. 785], original italics.)

The court did not reverse Witherspoon's substantive conviction for murder. It found the empirical studies tendered on his behalf on appeal "too tentative and fragmentary" to establish that the broad exclusion of

---

which the petitioner was entitled under the Sixth and Fourteenth Amendments. See *Glasser* v. *United States*, 315 U.S. 60, 84-86; *Irvin* v. *Dowd*, 366 U.S. 717, 722-723; *Turner* v. *Louisiana*, 379 U.S. 466, 471-473." (391 U.S. at p. 518 [20 L.Ed.2d at p. 783].)

While this statement might appear to indicate that the "impartial jury" requirements of the Sixth Amendment were being applied to state court proceedings, this interpretation does not withstand scrutiny. *Witherspoon* was decided only two weeks after the Supreme Court had announced for the first time that the Sixth Amendment right to a jury trial was binding on the states. (*Duncan* v. *Louisiana* (1968) 391 U.S. 145 [20 L.Ed.2d 491, 88 S.Ct. 1444].) Two weeks later, the court announced that *Duncan* applied prospectively, thereby precluding its application to state trials, such as Witherspoon's, which had preceded *Duncan*. (*DeStefano* v. *Woods* (1968) 392 U.S 631 [20 L.Ed.2d 1308, 88 S.Ct. 2093].)

It would appear that the constitutional principles being applied were those of due process, as seen through the filter of Sixth Amendment values. This interpretation is supported by the court's language that Witherspoon's death sentence "would deprive him of his life without due process of law." (391 U.S. at p. 523 [20 L.Ed.2d at p. 786].) It is further supported by the references to the court's prior decisions in *Irvin* and *Turner*. These two cases were decided at a time when states were not bound to provide trial by jury in criminal cases. Nevertheless, the court held that once the state "purported to accord" such a trial, the "nature" of the jury trial provided must conform to "Fourteenth Amendment commands." (*Turner* v. *Louisiana, supra*, 379 U.S. at p. 471 [13 L.Ed.2d at p. 428].) Among these commands was the right to "'a fair trial by a panel of impartial, "indifferent" jurors.'" (*Ibid.*, quoting from *Irvin* v. *Dowd, supra*, 366 U.S. at p. 722 [6 L.Ed.2d at p. 755].)

Some of the language in the *Witherspoon* opinion—e.g., the reference to the jury's role of "express[ing] the conscience of the community" in determining Witherspoon's punishment (391 U.S. at p. 519 [20 L.Ed.2d at p. 783])—suggests that "representative cross section" principles were applied. However, as will be more fully discussed below, it is doubtful that the *Witherspoon* decision was based on a purely cross sectional analysis. (Cf., *post*, fns. 38 and 45.)

[18]The court suggested that a juror, who believed that capital punishment should never be inflicted and who was irrevocably committed to its abolition, could not be removed for cause if he "could nonetheless subordinate his personal views to what he perceived to be his duty to abide by his oath as a juror and to obey the law of the State." (*Id.*, at p. 514, fn. 7 [20 L.Ed.2d at p. 781]; see also *id.*, at p. 515, fn. 9 [20 L.Ed.2d at p. 781]; *Boulden* v. *Holman* (1969) 394 U.S. 478, 483-484 [22 L.Ed.2d 433, 438-439, 89 S.Ct. 1138]; *Maxwell* v. *Bishop* (1970) 398 U.S. 262, 265 [26 L.Ed. 2d 221, 224, 90 S.Ct. 1578].)

jurors with scruples against capital punishment "results in an unrepresentative jury on the issue of guilt or substantially increases the risk of conviction."[19] (*Id.*, at pp. 517, 518 [20 L.Ed.2d at p. 782].) Noting that Witherspoon had specifically declined to present evidence below in support of his contention, the court stated, "We can only speculate, therefore, as to the precise meaning of the terms used in those studies, the accuracy of the techniques employed, and the validity of the generalizations made." (*Id.*, at p. 517, fn. 11 [20 L.Ed.2d at p. 782].) On the issue of guilt, the court found "the record . . . 'almost totally lacking in the sort of factual information that would assist the Court.'" (*Id.*, at p. 518, fn. 11 [20 L.Ed.2d at p. 782].)

Nevertheless, the court indicated that the question was still an open one.[20] Indeed, in footnote 18 of its opinion, page 520 [20 L.Ed.2d, page 784], the court noted that a defendant "in some future case might still attempt to establish that [a] jury [which had been 'death-qualified' in compliance with the newly announced *Witherspoon* standards] was less than neutral with respect to guilt."[21]

In the 12 years since the *Witherspoon* decision, the Supreme Court has not addressed the constitutionality of using a "*Witherspoon*-qualified" jury to determine the issue of guilt or innocence in a capital case.[22] However, the court has expounded upon the Sixth Amendment's guarantee of "trial by impartial jury" in two pertinent cases.

---

[19]On appeal, Witherspoon cited to the Supreme Court a survey by W. C. Wilson, an unpublished survey by Fay Goldberg (now Girsh), and a "preliminary, unpublished summary of the results" of a study by Hans Zeisel. (*Id.*, at p. 517, fn. 10 [20 L.Ed.2d at p. 782].) The Wilson survey and the final versions of the Girsh and Zeisel studies were presented to the court in the present case. (*Post*, at pp. 27-33.) Drs. Girsh and Zeisel also personally testified.

[20]One of the dissenting justices in *Witherspoon* stated he too "would not wholly foreclose the possibility of a showing that certain restrictions on jury membership imposed because of jury participation in penalty determination produce a jury which is not constitutionally constituted for the purpose of determining guilt." (391 U.S. at p. 541, fn. 1 [20 L.Ed.2d at p. 795] (dis. opn. of White, J.).)

[21]Footnote 18 then *continues:* "If he were to succeed in that effort, the question would then arise whether the State's interest in submitting the penalty issue to a jury capable of imposing capital punishment may be vindicated at the expense of the defendant's interest in a completely fair determination of guilt or innocence—given the possibility of accommodating both interests by means of a bifurcated trial, using one jury to decide guilt and another to fix punishment. That problem is not presented here, however, and we intimate no view as to its proper resolution."

[22]The issue was briefly addressed in *Bumpers* v. *North Carolina* (1968) 391 U.S. 543 [20 L.Ed.2d 797, 88 S.Ct. 1788], which was a companion case to and decided on the same day as *Witherspoon*.

In *Taylor* v. *Louisiana* (1975) 419 U.S. 522 [42 L.Ed.2d 690, 95 S.Ct. 692] the Supreme Court reversed the state court criminal conviction of a male defendant, since women had been systematically excluded from the jury pool.[23] In doing so, the court held for the first time that the states were bound by a Sixth Amendment fair-cross-section requirement.[24] The court held that the gross underrepresentation of women in the jury panel deprived Taylor of "the kind of factfinder to which he was constitutionally entitled." (419 U.S. at p. 526 [42 L.Ed.2d at p. 696].) No burden was placed on the accused to establish anything concerning the attitudes, propensities, or juryroom voting behavior of the group excluded (women) or the group included (men).[25] As has been recently noted, the *Taylor* court did not even consider "whether a jury composed of men only would be prejudiced or would have a 'tendency' to convict or acquit; it...simply [relied on] the requirement that the jury be selected from a panel representative of the community." (*Grigsby* v. *Mabry* (E.D.Ark. 1980) 483 F.Supp. 1372, 1380, app. pending 8th Cir.)[26]

The second important case dealing with the Sixth Amendment was *Ballew* v. *Georgia* (1978) 435 U.S. 223 [55 L.Ed.2d 234, 98 S.Ct. 1029]. There the court held that a criminal conviction rendered by a

---

[23]See also *Duren* v. *Missouri* (1979) 439 U.S. 357 [58 L.Ed.2d 579, 99 S.Ct. 664].

[24]While the right to a jury drawn from a representative cross section of the community has roots extending at least as far back as 1880 (see *Strauder* v. *West Virginia* (1880) 100 U.S. 303, 308 [25 L.Ed. 664, 665-666]), no single constitutional provision has been held to embody it. (Cf. *Peters* v. *Kiff* (1972) 407 U.S. 493, 498-500 [33 L.Ed.2d 83, 91-92, 92 S.Ct. 2163]; *People* v. *Wheeler* (1978) 22 Cal.3d 258, 270, fn. 8 [148 Cal.Rptr. 890, 583 P.2d 748] and accompanying text.)

[25]Unlike *Witherspoon*, where the court imposed on the *accused* the burden of establishing that a "death-qualified" jury was not constitutionally neutral, the court seemed to require in *Taylor* that the *state* demonstrate the constitutionality of an all-male jury. (419 U.S. at p. 537 [42 L.Ed.2d at p. 702].) In view of the fact that some of the attributes which women bring to jury service were likened to qualities "unknown and perhaps unknowable" (*id.*, at p. 532, fn. 12 [42 L.Ed.2d at p. 699]), the burden placed on the state in *Taylor* appears an impossibility.

[26]The high court in *Taylor* did believe that women were "distinct" from men, that "'the subtle interplay of influence one on the other is among the imponderables,'" and that "'a flavor, a distinct quality is lost if either sex is excluded.'" (419 U.S. at pp. 531-532 [42 L.Ed.2d at p. 699], quoting from *Ballard* v. *United States* (1946) 329 U.S. 187, 193-194 [91 L.Ed. 181, 185-186, 67 S.Ct. 261].)

five-person jury violated the Sixth and Fourteenth Amendments. *Ballew* represented the culmination of a line of decisions, concerning jury size or unanimous verdict, which set forth a new analysis of the Sixth Amendment.[27] Under this approach the court determines whether the "purpose and functioning of the jury in a criminal trial" is impaired to a significant degree by the challenged procedure (e.g., by the procedure of permitting a conviction to be based on the verdict of a five-member jury). (*Ballew* v. *Georgia, supra*, 435 U.S. at p. 239 [55 L.Ed.2d at p. 246].)[28] To ascertain the impact on the jury's purpose and functioning, the court in *Ballew* relied extensively on relevant scholarly and empirical studies. (*Id.*, at pp. 231-239, 244-245 [55 L.Ed.2d at pp. 241-246, 249-250].)[29]

The high court has stated that trial by jury in a criminal case "safeguard[s] against the corrupt or overzealous prosecutor and against the compliant, biased, or eccentric judge"[30] and "assure[s] a fair and equitable resolution of factual issues."[31] These purposes are achieved "by the participation of the community in the determinations of guilt and by the application of the common sense of laymen who, as jurors, consider the case." (*Ballew* v. *Georgia, supra*, 435 U.S. at p. 229 [55 L.Ed.2d at p. 240].)

---

[27]*Williams* v. *Florida* (1970) 399 U.S. 78 [26 L.Ed.2d 446, 90 S.Ct. 1893] [conviction of a noncapital felony offense by a unanimous six-person jury does not violate Sixth Amendment]; *Johnson* v. *Louisiana* (1972) 406 U.S. 356 [32 L.Ed.2d 152, 92 S.Ct. 1620] [conviction of a noncapital felony offense by a 9-3 vote of a jury does not violate due process]; *Apodaca* v. *Oregon* (1972) 406 U.S. 404 [32 L.Ed.2d 184, 92 S.Ct. 1628] [conviction of a noncapital felony offense by a 10-2 vote of a jury *in state court* does not violate Sixth and Fourteenth Amendments]; *Burch* v. *Louisiana* (1979) 441 U.S. 130 [60 L.Ed.2d 96, 99 S.Ct. 1623] [conviction of a misdemeanor by a nonunanimous six-person jury violates Sixth Amendment]. Cf., *Colgrove* v. *Battin* (1973) 413 U.S. 149 [37 L.Ed.2d 522, 93 S.Ct. 2448] [verdict by six-person jury in federal civil trial does not violate Seventh Amendment].

[28]If the requisite showing of impairment is made, the court next considers "whether any state interest counterbalances and justifies the disruption so as to preserve [the] constitutionality" of the procedure in question. (*Id.*, at p. 231 [55 L.Ed.2d at p. 241].)

[29]See also *Williams* v. *Florida, supra*, 399 U.S. at pages 101-102 [26 L.Ed.2d at pages 460-461]; *Apodaca* v. *Oregon, supra*, 406 U.S. at page 411, footnote 5 [32 L.Ed.2d at page 191] (plur. opn.) [32 L.Ed.2d at p. 191]; *Colgrove* v. *Battin, supra*, 413 U.S. at pages 158-160 [37 L.Ed.2d at pages 529-531]; *Burch* v. *Louisiana, supra*, 441 U.S. at page 138 [60 L.Ed.2d at page 103] [striking down conviction based on nonunanimous verdict of six-person jury on the basis of "much the same reasons" as in *Ballew*].

[30]*Duncan* v. *Louisiana, supra*, 391 U.S. at page 156 [20 L.Ed.2d at page 500].

[31]*Colgrove* v. *Battin, supra*, 413 U.S. at page 157 [37 L.Ed.2d at page 529].

In the context of a challenge to the size of a criminal jury, the court in *Ballew* articulated several concerns of constitutional dimension. It held that a jury should be "of sufficient size to promote group deliberation, to insulate members from outside intimidation, and to provide a representative cross-section of the community." (*Id.*, at p. 230 [55 L.Ed.2d at p. 240]; see also *Williams* v. *Florida, supra,* 399 U.S. at p. 100 [26 L.Ed.2d at p. 460].) A five-member jury was inadequate, the court reasoned, because "recent empirical data" suggested such a jury was "less likely to foster effective group deliberation," resulting in "inaccurate factfinding and incorrect application of the common sense of the community to the facts." (435 U.S. at p. 232 [55 L.Ed.2d at p. 242].)

In addition, smaller juries were "less likely. . .to overcome the biases of its members to obtain an accurate result. . . .[T]he counterbalancing of various biases is critical to the accurate application of the common sense of the community to the facts of any given case." (*Id.*, at pp. 233-234 [55 L.Ed.2d at pp. 242-243].) Further, the court enunciated an independent constitutional interest in protecting the representation on juries of minority *viewpoints* in the community[32] and of minority *groups.* (*Id.*, at pp. 236-237 [55 L.Ed.2d at p. 244].) It concluded that decreasing jury size from six to five "foretells problems" for each of these interests. (*Ibid.*)

Empirical research was also used by the court in its determination that smaller juries decreased the jury's ability to "remember all the important facts and arguments" (435 U.S. at p. 241 [55 L.Ed.2d at p. 247.]) and reduced the likelihood that juries would "compromise over the various views of their members, an important phenomenon for the fulfillment of the commonsense function." (*Id.*, at p. 235, fn. omitted [55 L.Ed.2d at pp. 243-244].) Smaller juries were also found to result in inconsistent verdicts and to decrease the incidence of hung juries. (*Id.*, at pp. 234, 236 [55 L.Ed.2d at pp. 242-243, 244].)

Thus, the court concluded, "the assembled data raise substantial doubt about the reliability and appropriate representation of panels smaller than six. Because of the fundamental importance of the jury trial to the American system of criminal justice, any further reduction that promotes inaccurate and possibly biased decisionmaking, that causes untoward differences in verdicts, and that prevents juries from

---

[32]See also *Burch* v. *Louisiana, supra,* 441 U.S. at page 135, footnote 7 [60 L.Ed.2d at page 102] and accompanying text.

truly representing their communities, attains constitutional signifi-
cance." (*Id.*, at p. 239 [55 L.Ed.2d at p. 246].)[33]

## III

### THE ISSUES PRESENTED

The instant writ petition presents fundamentally two challenges to
the current system of jury selection in capital cases. First, must the
class of prospective jurors, who may now be excluded for cause under
*Witherspoon* standards from both phases of the trial, be narrowed to
permit a specific subcategory to serve at the guilt phase? ██ *Wither-
spoon* authorized the exclusion for cause of prospective jurors who
make "unmistakably clear" either (1) that they would automatically
vote against the death *penalty* if there were a penalty phase, regardless
of the evidence adduced at trial,[34] or (2) that their doubts about or op-
position to capital punishment would preclude them from fairly and
impartially determining *guilt* at the guilt phase.[35] (391 U.S. at

---

[33]It has been suggested that Justice Blackmun's opinion announcing the judgment of
the court did not obtain the concurrence of a majority of the court because it was co-
signed only by Justice Stevens. Although Justices Brennan, Stewart, and Marshall
concurred in a separate opinion, they did specifically "join Mr. Justice Blackmun's
opinion insofar as it holds that the Sixth and Fourteenth Amendments require juries in
criminal trials to contain more than five persons." (435 U.S. at p. 246 [55 L.Ed.2d at
p. 250].)

These three concurring justices wrote separately in order to express their views on a
wholly unrelated issue which Justice Blackmun's opinion did not reach, i.e., whether
the statute under which Ballew was prosecuted was "overbroad and therefore facially
unconstitutional." (*Ibid.* [55 L.Ed.2d at p. 251].) If the concurring justices wanted to
concur only in the judgment announced by Justice Blackmun, as the Attorney General
suggests, surely they would have used words explicitly so stating. They would not have
written that they "join Mr. Justice Blackmun's opinion...."

[34]As a shorthand reference to this group, this opinion uses the term "automatic life
imprisonment" group. The members of this group would automatically vote to impose
life imprisonment in every capital trial.

As used in this opinion, the phrase "death-qualified" is a general term referring to
any capital case jury from which prospective jurors have been excluded for cause be-
cause of their attitudes toward the death penalty. Since the *Witherspoon* decision
substantially limited many jurisdictions' exclusions for cause of jurors opposed to cap-
ital punishment, the precise composition of a "death-qualified" jury will depend upon
the year and jurisdiction in which it has been selected.

A jury which has been "death-qualified" in conformity with *Witherspoon* standards
is denominated a "*Witherspoon*-qualified" jury. (Cf., *post*, fn. 70.) In California and in
at least a few other jurisdictions, a "death-qualified" jury is composed of a somewhat
smaller pool of persons than is a "*Witherspoon*-qualified" jury. (Cf., *post*, fns. 48, 71,
and pp. 63-69.) In referring to a jury that has been "death-qualified" under this state's
law, the phrase "California death-qualified" jury will be used.

[35]This second group will be referred to as the "guilt phase nullifiers."

pp. 522-523, fn. 21 [20 L.Ed.2d at p. 785].) Petitioner does not suggest that either of these two groups be allowed to serve at the penalty phase of a capital trial. Nor does he contend that the second group—those who could not be fair and impartial at the guilt phase—may serve at the guilt phase. Rather, it is argued that prospective jurors, who would automatically vote against death at the *penalty* phase, cannot constitutionally be excused for cause from sitting at the *guilt* phase if they can be fair and impartial *at that phase*.[36]

Two separate constitutional theories are advanced to reach this conclusion. One is bottomed on *Witherspoon.* ■ ■■■■ Under it, petitioner contends there is evidence which can "establish"[37] that a jury from which all "guilt phase includables" have been removed for cause is "less than neutral with respect to guilt."[38] (391 U.S. at p. 520, fn. 18

---

[36]This group, which petitioner seeks to have included in the jury pool for the guilt phase of a capital trial, is a subgroup of the "automatic life imprisonment" class. (Cf., *ante*, fn. 34.) Its members will be referred to as the "guilt phase includables."

[37]*Witherspoon* v. *Illinois, supra*, 391 U.S. at pages 517 and 520, footnote 18 [20 L.Ed.2d at pages 782, 784].

The respondent court in the present proceeding held that an accused has the burden of establishing his contentions by "clear and convincing proof." There is no indication in the record as to why the court selected this particular burden of proof. No relevant case law mentions it.

To the contrary, the Supreme Court in *Ballew* v. *Georgia, supra*, 435 U.S. at page 239 [55 L.Ed.2d at page 246], applied a "substantial doubt" standard. That standard was cited with approval by the court in *Burch* v. *Louisiana, supra*, which held that the procedures challenged in that case were unconstitutional because they presented a "threat" to the preservation of the guarantees inherent in the right to a jury trial. (441 U.S. at pp. 137-138 [60 L.Ed.2d at p. 103].)

While *Ballew* and *Burch* were decided under a constitutional analysis distinct from *Witherspoon's*, these cases deal fundamentally with the same basic topic—the scope of the constitutional right to a trial by an impartial tribunal. It is highly unlikely that the Supreme Court would require different burdens of proof under each analysis. Moreover, the *Witherspoon* decision was based, at least in part, on the due process clauses of the Constitution (cf. *ante*, pp. 10-11, fn. 17). The high court has long held that due process is violated by circumstances that create the "risk" or "likelihood" of bias or unfairness. (*Peters* v. *Kiff, supra*, 407 U.S. at pp. 502-503 [33 L.Ed.2d at p. 93] (lead opn. of Marshall, J.); *Tumey* v. *Ohio* (1927) 273 U.S. 510, 532 [71 L.Ed. 749, 758, 47 S.Ct. 437, 50 A.L.R. 1243].)

Therefore, petitioner's burden of proof in the present proceeding is to establish a "substantial doubt" as to whether a "California death-qualified" jury is neutral with respect to guilt.

[38]Some courts have raised doubts as to whether the Supreme Court would today require an accused to establish that the jury is "less than neutral with respect to guilt," as *Witherspoon* apparently requires. (See, e.g., *Grigsby* v. *Mabry, supra*, 483 F.Supp. at pp. 1379-1385.) Portions of the *Witherspoon* decision can be read as relying on a "representative cross section" type of analysis (391 U.S. at pp. 519-521 [20 L.Ed.2d at pp. 783-784]). However, the cross section cases subsequent to *Witherspoon* have clearly

[20 L.Ed.2d at p. 784], italics omitted.) The other constitutional theory relies on the "purpose and functioning" analysis developed in *Ballew* v. *Georgia, supra*, 435 U.S. 223, and the line of decisions it represents. This theory would require the court to determine—under a "substantial doubt" standard[39]—whether the interests protected by the Sixth Amendment are significantly inhibited by the disqualification at the guilt phase of all the "guilt phase includable" jurors.

The second basic challenge to the current system of selecting a jury for a capital case focuses on the voir dire *procedure* by which the jury is selected, rather than on the *composition* or *functioning* of the jury itself. The argument is advanced that whoever is chosen to serve on a jury in a capital case, he or she will be affected by the methods now employed to identify those persons whose views on capital punishment render them ineligible.[40] The result, it is contended, is a jury likely to be "less than neutral" with respect to guilt and penalty. Petitioner suggests that certain procedural refinements would minimize this possibility.

---

implied that "neutrality" and "guilt proneness" are not relevant considerations under a pure cross section approach. (*Taylor* v. *Louisiana, supra*, 419 U.S. 522; *Duren* v. *Missouri, supra*, 439 U.S. 357.) The defendant did not show in *Taylor* or *Duren* that an all-male jury was "less than neutral with respect to guilt." Rather, the court reversed in each case "simply [on the basis of] the requirement that the jury be selected from a panel representative of the community." (See *Grigsby* v. *Mabry, supra*, 483 F.Supp. at p. 1380.)

The impact of *Taylor* and *Duren* on the holding in *Witherspoon* is open to some dispute. It would appear that the *Witherspoon* decision was based, not upon the cross section requirement, but upon Fourteenth Amendment due process principles and Sixth Amendment concerns. (See 391 U.S. at pp. 518, 523 [20 L.Ed.2d at pp. 782-783, 785-786]; cf. *ante*, fn. 17.) While the *Witherspoon* analysis does involve significant cross section concerns (as does the *Ballew* approach), it would appear that the purely cross sectional cases such as *Taylor* and *Duren* represent a third line of constitutional analysis that is analytically separate from those of *Witherspoon* and *Ballew*. (Cf. *post*, fn. 45.) Petitioner has specifically declined to invoke the *Taylor* approach in the present case. Consequently, today's decision does not reach the validity of any argument based on a pure cross section analysis.

[39]*Ballew* v. *Georgia, supra*, 435 U.S. at page 239 [50 L.Ed.2d at page 246]; see also *Burch* v. *Louisiana, supra*, 441 U.S. at page 137 [60 L.Ed.2d at page 103]. Cf. *ante*, footnote 37.

[40]This contention is not dependent upon how the *Witherspoon* and *Ballew* issues are resolved. Regardless of this court's decision on these issues, it is necessary to determine the outlines of a fair procedure for identifying and excluding ineligible jurors. Petitioner concedes there must be at least some "death qualification" of the jury, even if his *Witherspoon* and/or *Ballew* contentions are sustained, since he does not challenge the exclusion of the "guilt phase nullifiers" from the guilt phase nor the exclusion of the "automatic life imprisonment" group from the penalty phase.

## IV

### The Concept of a Neutral Jury

Central to the resolution of the *Witherspoon* issue is the concept of a constitutionally "neutral" jury. Since this concept has a particular meaning, one which is occasionally misperceived,[41] it is necessary to consider the concept in some detail.

When the Supreme Court in *Witherspoon* held that "as arbiter of the punishment to be imposed, this jury fell woefully short of that impartiality to which the petitioner was entitled under the Sixth and Fourteenth Amendments,"[42] it was not ruling that any of the jurors who actually sat on Witherspoon's penalty trial were themselves biased in a constitutional sense. If this had been the court's concern, it would have ordered that such jurors be excluded from future capital cases.

Instead, the high court was relying on a different facet of the constitutional requirement of impartiality, an aspect that has been referred to as a guarantee of "diffused impartiality."[43] It is denoted in this opinion (and in *Witherspoon*[44]) as "neutrality." ■ A neutral jury is one drawn from a pool which reasonably mirrors the diversity of experi-

---

[41]The *Witherspoon* issue is sometimes discussed as if the question were whether those jurors who currently are eligible to serve in capital cases (i.e., who are "death-qualified") are likely to be so biased against defendants and so partial in favor of the prosecution that they should themselves be excused for cause.

That is not in fact what petitioner argues nor what his evidence is intended to establish. Rather, he seeks to prove that a jury drawn from a pool composed *only* of jurors "death-qualified" under current standards will be unbalanced, i.e., not "neutral." He contends that the process of death-qualifying a jury tends to eliminate from the pool of *fair and impartial jurors* that portion of the spectrum of viewpoints or experience which is most likely to be favorable to him at the trial on guilt or innocence.

The Fifth Circuit stumbled and missed the real issue in *Spinkellink* v. *Wainwright* (1978) 578 F.2d 582, certiorari denied, 440 U.S. 976 [59 L.Ed.2d 796, 99 S.Ct. 1548], rehearing denied 441 U.S. 937 [60 L.Ed.2d 667, 99 S.Ct. 2064]. That court perceived the issue to be whether "generally speaking, persons not opposed to capital punishment are so bent in their hostility to criminals as to be incapable of rendering impartial verdicts on the law and the evidence in a capital case." (*Id.*, at p. 595.) That is not the contention advanced here.

[42]391 U.S. at page 518 [20 L.Ed.2d at page 783].

[43]*Thiel* v. *Southern Pacific Co.* (1946) 328 U.S. 217, 227 [90 L.Ed. 1181, 1188, 66 S.Ct. 984, 166 A.L.R. 1412] (dis. opn. of Frankfurter, J.); *Taylor* v. *Louisiana, supra*, 419 U.S. at page 530 [42 L.Ed.2d at page 698].

[44]391 U.S. at page 520, footnote 18 and accompanying text [20 L.Ed.2d at page 784].

ences and relevant viewpoints of those persons in the community who can fairly and impartially try the case.[45]

The concept of neutrality through diversity is demonstrated by the holding in *Witherspoon*. Assume that a jury must be empanelled to determine the question of punishment in a capital case. In the group of persons from the community who are statutorily competent to act as trial jurors,[46] it can be expected that an entire spectrum of beliefs concerning the infliction of capital punishment—from persons who would invariably and automatically refuse to impose capital punishment[47] to jurors who would automatically vote to impose the death penalty following a conviction for a capital offense[48]—would be found. This spectrum of community viewpoints may be depicted as follows:

| "AUTOMATIC DEATH PENALTY" GROUP | "FAVOR DEATH PENALTY" GROUP | "INDIFFERENT" GROUP | "OPPOSE DEATH PENALTY" GROUP | "AUTOMATIC LIFE IMPRISONMENT" GROUP |
|---|---|---|---|---|
| will automatically vote for the death penalty | favors the death penalty but will not vote to impose it in every case. | neither favors nor opposes the death penalty | opposes or has doubts about the death penalty but will not automatically vote against it in every case. | will automatically vote for life imprisonment |

[45]The concept of a neutral jury is intimately related to the constitutional doctrine regarding a representative cross section of the community. (See, e.g., *Taylor* v. *Louisiana, supra*, 419 U.S. 522; *Duren* v. *Missouri, supra*, 439 U.S. 357.) Unless *Taylor* and *Duren* have considerably modified the *Witherspoon* approach (a proposition which this court doubts, cf. *ante*, fn. 38), it would appear that the two doctrines are different analytically.

*Witherspoon* can be squared with the holdings in *Taylor* and *Duren*. The overriding constitutional principle in all these cases is that a jury must be drawn from a pool that fairly represents the community. However, if persons are excluded from jury service, analysis of the propriety of the exclusion will depend upon whether the persons left out comprise a constitutionally cognizable class, as defined in *Duren, supra*, 439 U.S. at page 364 [58 L.Ed.2d at pages 586-587]. If they do—as in the cases at least of traditional minorities such as blacks, persons of Mexican descent, and women—then the court will apply the *Taylor-Duren* analysis, which effectively presumes that the exclusion resulted in a nonneutral jury. If no cognizable class is involved, then the individual challenging the exclusion bears a burden of demonstrating—by empirical proof or otherwise—that the resulting jury is probably not neutral and that this nonneutrality operates to his detriment.

As previously noted (*ante*, fn. 38), petitioner has declined to raise the issue of cognizable class and thus has assumed the burden of demonstrating that a "death-qualified" jury is likely to be nonneutral.

[46]See Code of Civil Procedure sections 198 through 202.5.

[47]This group has been previously denominated the "automatic life imprisonment" group. (Cf. *ante*, p. 16, fn. 34.)

[48]This group will be referred to as the "automatic death penalty" group.

Prior decisions in this state have strongly suggested that members of this group must

Under the state procedure in effect at the time Witherspoon's penalty was determined, all persons in the "oppose death penalty" group and the "automatic life imprisonment" group were excluded for cause. Thus, Witherspoon's jury was drawn from a pool of persons which did not reflect the range of community viewpoints on a critical aspect of the case.[49] It also contained at least one group—the "favor death penalty" group—whose members came into trial with preconceived attitudes about the imposition of the death penalty which tended to favor one of the litigants, i.e., the prosecution.

In holding that a jury so constituted "crossed the line of neutrality,"[50] the court found that the jury was not impartial within the meaning of the Sixth and Fourteenth Amendments because it was too *narrowly* drawn. Members of the community who could "obey the oath" to fairly decide the case before them were excluded.[51] As a result, a segment of the population that would tend to be favorable toward the accused was eliminated. The resulting jury was less than neutral with respect to penalty so a reversal of the penalty determination was required.

Clearly, the constitutional principle of achieving jury neutrality through diversity is relevant to a determination of guilt as well as penalty. Every juror brings to the guilt phase a number of personal characteristics which will "play an inevitable role" in assessing the accused's

---

be excused if challenged for cause at a capital trial. (*People* v. *Hughes* (1961) 57 Cal.2d 89, 94-95 [17 Cal.Rptr. 617, 367 P.2d 33]; see also *People* v. *Gilbert, supra*, 63 Cal.2d at p. 712. Cf., e.g., *Stroud* v. *United States* (1919) 251 U.S. 15, 20-21 [64 L.Ed. 103, 111, 40 S.Ct. 50], mem. opn. on denial of petn. for rehg. 251 U.S. 380, 381-382 [64 L.Ed. 317, 40 S.Ct. 176]; see also *Spinkellink* v. *Wainwright, supra*, 578 F.2d at p. 594.)

[49]The jury pool did contain members of the "indifferent" group and the "favor death penalty" group. It is not known for certain whether Illinois, like California, excused for cause persons in the "automatic death penalty" group. However, there is some suggestion in *Witherspoon* that a state's exclusion of the "automatic life imprisonment" group might violate due process if the state did not similarly exclude the "automatic death penalty" group. (391 U.S. at pp. 521-522, fn. 20 [20 L.Ed.2d at pp. 784-785], citing *Crawford* v. *Bounds* (4th Cir. 1968) 395 F.2d 297, 303-304 (alternative holding).)

[50]391 U.S. at page 520 [20 L.Ed.2d at page 784].

[51]*Id.*, at page 519 [20 L.Ed.2d at page 783].

The court upheld the state's decision to exclude for cause the "automatic life imprisonment" group. (*Id.*, at p. 522, fn. 21 [20 L.Ed.2d at p. 785].) This, too, removed from the jury pool some community viewpoints. Nevertheless, the court impliedly found that this exclusion was proper because these jurors could not be fair and impartial. Such jurors would "automatically vote against the imposition of capital punishment *no matter what the trial might reveal.*" (*Id.*, at p. 516, fn. 9 [20 L.Ed.2d at p. 781], italics added.) The Constitution does not compel a state to accept jurors unfavorable to it if they will not render a verdict on the evidence and the law.

guilt or degree of guilt. (See *Witherspoon* v. *Illinois, supra*, 391 U.S. at p. 519 [20 L.Ed.2d at p. 783].) As members of this court have recently observed, "each juror brings to the deliberations [on guilt or innocence] his personal store of experience, knowledge, and judgment; these are the tools by which he tests 'the credibility, the probability of the testimony of witnesses, or of the inferences to be drawn from circumstances....'" (*People* v. *Brigham* (1979) 25 Cal.3d 283, 299 [157 Cal.Rptr. 905, 599 P.2d 100] (conc. opn. of Mosk, J.) quoting Trickett, *Preponderance of Evidence, and Reasonable Doubt* (1906) 10 The Forum 75, 82.) In addition, the juror must determine whether the evidence thus evaluated amounts to proof "beyond a reasonable doubt" of the truth of the charges. The difficulty in defining "this elusive and undefinable state of mind" has been chronicled by scholars.[52] "Each of us, in effect, has his own subjective sense of when a chance of innocence can be disregarded as de minimis, but our respective senses are surely different."[53]

Manifestly, fair and impartial jurors will bring to the determination of guilt a diversity of experience, knowledge, judgment, and viewpoints, as well as differences in their "thresholds of reasonable doubt." If some of these jurors are systematically removed from the guilt determination, this may result in a disproportionate elimination of persons with characteristics favorable to the accused. If so, the ensuing jury will be "less than neutral with respect to guilt," just as the jury at the penalty phase in *Witherspoon* was not neutral with respect to penalty.[54]

---

[52] 9 Wigmore, Evidence (3d ed. 1940) section 2497, page 317; see *People* v. *Brigham, supra*, 25 Cal.3d at page 292 et seq. (conc. opn. of Mosk, J.).

[53] Nesson, *Reasonable Doubt and Permissive Inferences: The Value of Complexity* (1979) 92 Harv. L.Rev. 1187, 1197; *People* v. *Brigham, supra*, 25 Cal.3d at page 313 (conc. opn. of Mosk, J.). Cf., Kalven & Zeisel, The American Jury (1966) chapter 14, page 182 et seq.

[54] For present purposes it is assumed that a constitutionally "neutral" jury is one which is drawn from the pool of persons eligible to serve in a noncapital criminal trial. An individual's attitude toward capital punishment is irrelevant to his or her eligibility for jury service in a noncapital case. Thus, a neutral jury pool will normally include members of each of the five groups on the spectrum of capital punishment attitudes.

A "death-qualified" jury is drawn from a subpopulation of this neutral jury pool. Under present law, certain persons are ineligible for a "death-qualified" jury because of their attitudes toward the death penalty. However, many jurors who are unable to be fair and impartial at the penalty phase would be capable of giving a fair hearing as to issues of guilt or innocence. Therefore, it follows that when a "death-qualified" jury pool is used to select jurors for the guilt phase of a trial, prospective jurors are excluded who could be fair and impartial at that phase.

Under *Witherspoon*, the use of a "death-qualified" jury pool to select a guilt phase jury would be unconstitutional if juries so selected would tend to return more verdicts favorable to the prosecution than would juries selected from a "neutral" jury pool.

Including diverse viewpoints on a jury serves several purposes.[55] Diversity aids the accuracy of jury decision making by "counterbalancing...various biases" of the jury members. (*Ballew* v. *Georgia, supra*, 435 U.S. at p. 234 [55 L.Ed.2d at p. 242].) As this court recently noted in a fair-cross-section case, "in our heterogeneous society jurors will inevitably belong to diverse and often overlapping groups defined by race, religion, ethnic or national origin, sex, age, education, occupation, economic condition, place of residence, and political affiliation;...it is unrealistic to expect jurors to be devoid of opinions, preconceptions, or even deep-rooted biases derived from their life experiences in such groups; and hence...the only practical way to achieve an overall impartiality is to encourage the representation of a variety of such groups on the jury so that the respective biases of their members, to the extent they are antagonistic, will tend to cancel each other out." (*People* v. *Wheeler* (1978) 22 Cal.3d 258, 266-267, fn. omitted [148 Cal.Rptr. 890, 583 P.2d 748].)

Diversity serves to complement as well as neutralize viewpoints and attitudes. Diversity enhances the accuracy of a jury's decision making by improving its ability to recognize and appropriately evaluate evidence. Testimony from the hearing below, as well as studies in social psychology, help to explain why this is so. Human perception is selective, influenced by the very beliefs and attitudes which venirepersons bring into the courtroom. New data which tend to contradict one's beliefs may be quickly "forgotten" or may not even be perceived in the first place. The members of a homogeneously composed jury are more likely to perceive evidence in a similar fashion. Also, they are more likely to filter out any evidence inconsistent with their shared attitudes and values. Insofar as a jury is composed of members whose attitudes, preconceptions, and experiences are diverse, the jury is more likely to perceive and remember all the important evidence and arguments presented at trial.

In similar fashion, the human mind often tends to make any new information with which it is confronted logically consistent with its prior conscious beliefs. Thus, if a juror's beliefs do not correspond to the evidence presented at trial, the juror's "rational nature" may tend to impel him or her to distort or exclude the perception so as to protect the ap-

---

[55]Many of the reasons underlying the constitutional requirement of neutrality are also concerns in the "jury purpose and functioning" analysis of *Ballew* v. *Georgia, supra*, 435 U.S. 223. To this extent, then, *Witherspoon* and *Ballew* overlap.

parent reasonableness of the belief. Thus, diversity provides a corrective to the distortions which can occur when the evidence presented at trial is inconsistent with the preconceptions of some members of the jury.

Jury diversity helps to insure the full and accurate consideration of the evidence presented at trial in another way. A jury resolves conflicting propositions of fact and does so by drawing inferences from physical evidence and the testimony of witnesses. Yet "[f]acts are always elusive and often two-faced. What may appear to one to imply guilt may carry no such overtones to another." (*Johnson* v. *Louisiana, supra*, 406 U.S. at p. 392 [32 L.Ed.2d at p. 177] (dis. opn. of Douglas, J.).) As this court noted more than a century ago, "the human mind is so constituted, that facts and circumstances do not always produce the same results; the judgment of two men upon the same set of facts may be diametrically opposite, particularly in the determination of a criminal case, when every doubt is carefully weighed and scrupulously balanced." (*People* v. *Stewart* (1857) 7 Cal. 140, 144.)

If a jury is accurately to assess evidence, it should have some expertise both in generating the inferences which may reasonably be drawn from the evidence and in evaluating the relative plausibility of the competing inferences. The greater the diversity of individual viewpoints and experiences on the jury panel, the broader the range of appropriate inferences the jury can draw from the evidence at trial and the more knowledgeable their interpretation and weighing of these inferences one against the other. For example, jurors in criminal cases are often called upon to infer mental states from behavior. In a culturally pluralistic society, particular behavior can have dramatically different meanings to members of different subcultures. A jury with diverse membership will recognize a fuller range of possible meanings or explanations for particular behavior, and it will be able to evaluate those possible meanings in light of the diverse experiences of the panel members regarding values, norms, behavior, motivation, and psychology.

Finally, even if the evidence and inferences were agreed upon by all jurors, the legal effect may be subject to dispute. For example, jurors must determine whether the evidence amounts to proof beyond a reasonable doubt of the guilt of the accused. However, jurors' thresholds of reasonable doubt will necessarily differ. Diversity of viewpoint and experience on the jury tends to insure that the common sense of the community is accurately expressed in applying this standard to the facts.

Of course, a juror's attitudes, experiences, knowledge, judgment, and threshold of reasonable doubt are not the sole factors which decide how that juror votes. Rather, as the defense experts repeatedly testified below, the weight of the evidence is the primary determinant of the juror's decision. Thus, Kalven and Zeisel reported in their classic study, The American Jury, that roughly one-third of the juries to which criminal cases have been submitted reach a unanimous verdict for acquittal or conviction on the very first ballot. (*Supra*, p. 488.) "That means," Dr. Zeisel testified with respect to these cases, "that whatever differences between personalities exist, [they] are overwhelmed by the clarity of the evidence, be it for acquittal or conviction."

The corollary to this finding is that in two-thirds of criminal trials, the jurors disagree in their initial ballot.[56] Since the 12 jurors were exposed to the identical external events or "stimuli"—i.e., the same witnesses, evidence, instructions, courtroom personalities, preliminary deliberations (if any)—the inescapable conclusion is, as Dr. Zeisel testified, that "there must be something inside these people which makes them differ." It is petitioner's contention under the *Witherspoon* analysis that the process of "death-qualifying" a jury produces a jury whose composition is unbalanced. It tends disproportionately to remove from the jury pool those persons who have "something inside" which results in their voting in favor of the accused more often than do persons who remain. As a result, jurors drawn from the remaining pool will tend to vote in favor of the prosecution more often than would jurors drawn from a pool which includes a more complete spectrum of attitudes on capital punishment.[57]

---

[56]Kalven and Zeisel found that in about 90 percent of the cases where the jurors disagree on the first ballot, the jury will eventually reach a verdict consistent with the position of the first ballot majority. (The American Jury, *supra*, p. 488.) They also found that even where the jury vote is six-to-six on the first ballot, a unanimous verdict is nevertheless normally achieved. (*Ibid.*)

[57]Petitioner does not claim that each excluded juror will vote in favor of the accused and each "death-qualified" juror in favor of the prosecution. The differences alleged are those between overall groups, not specific individuals. Within each group there will be a wide distribution of behavior, attitudes, and viewpoints, and there will be considerable overlap between the groups.

Thus, even if petitioner can establish that a "death-qualified" jury is not neutral, it will nevertheless be impossible to specify in which individual trial the exclusion of the "guilt phase includables" will prejudice the accused. However, it can be confidently asserted that, over time, some persons accused of capital crimes will be convicted of offenses—and to a higher degree—who would not be so convicted if the jury were more representative of the populace.

One final point deserves emphasis. In determining the constitutional "neutrality" of a "death-qualified" jury, it is unnecessary to make any judgment that one viewpoint, attitude, experience, etc., is preferable, morally or legally, to any other. What is essential under this analysis is that none of these viewpoints, attitudes, experiences, etc., are systematically excluded from the jury pool, either directly or by de facto operation of otherwise neutral laws or practices, to the detriment of the accused.

## V

### The Evidence Relating to the Witherspoon and Ballew Contentions

Roughly two dozen studies, experiments, and surveys were introduced at or were the subject of expert testimony during the evidentiary hearing below. This material can logically be grouped for analytical purposes into four categories: (1) the research relating directly to conviction proneness or juror voting behavior; (2) the research relating to juror attitudes; (3) the research relating to demographic characteristics; and (4) the research relating to differences in juror evaluation of evidence.[58]

---

[58]Nearly all the research in this case involves the comparison of various groups of persons. In evaluating the results of such comparisons, it is important to know whether any differences which may occur are reflections of true differences between the groups or whether those differences might be attributable simply to chance occurrences, i.e., to the statistical fact that comparisons of groups randomly selected from larger populations may reveal differences that would not in fact appear if the entirety of their respective parent populations were compared. Standard mathematical procedures have been developed to evaluate the probability that such differences are due to chance. The most commonly used procedure—and the one used throughout the hearing below—is the "$\chi^2$ test."

The $\chi^2$ test generates probabilities—or "p" values—indicating the likelihood or probability that the differences observed are due to chance. The lower the "p" value, the less likely it is that the differences are due to chance and the more likely that they are real. A "p" value of .08 means that there is an 8 percent probability that the differences are due to chance and a 92 percent probability that there are real differences between the groups.

Normally in the social sciences, a "p" value of .05 is said to be "statistically significant." Values between .05 and .10 are said to be "marginally significant," and a "p" value of .01 is considered "highly significant." A "p" value above .10 is generally said to be "not significant."

A finding that a "p" value exceeds .10 does not necessarily indicate that the observed differences are in fact spurious. The $\chi^2$ test is dependent, inter alia, upon the size of the sample groups being compared. True differences between groups may be reported as "not significant" under the $\chi^2$ test simply because the sample sizes are too small. More-

CONVICTION PRONENESS

An ideal experiment can be conceived to test directly the hypothesis that a "death-qualified" jury is more conviction-prone than is a non-death-qualified jury. A large number of jurors would sit through a real jury trial. At its conclusion, they would break up into components of 12. Some panels would be comprised wholly of "death-qualified" jurors and some would not. They would deliberate as a jury and return a verdict. By comparing the percentage of cases in which each type of jury returned not guilty verdicts, verdicts of guilty on the various degrees of the offenses, and verdicts on lesser included offenses, the proposition could be directly tested.

However, such an experiment is legally impossible. Thus, the hypothesis must be tested indirectly. One method of indirect analysis is to locate persons who have actually sat on juries and ask them what they did. The strength of this method—which was used in the *Zeisel* study that follows—is that its data are derived from a very realistic setting: an actual trial. The weakness of this method is the difficulty of controlling for a very important variable: the strength of the evidence. Since it is difficult to assure that the subjects of this type of research experienced the same kind of evidence, it is correspondingly difficult to determine whether any differences discovered reflect true differences in the subjects or merely differences in the stimuli to which they have been exposed.

A second type of approach in researching this issue is a controlled study, i.e., a study done in a controlled setting, in which realistic stimuli are so presented that every subject/juror is exposed to the exact same stimuli. If this is done well, then any differences observed must be real differences between the people and not differences in the kinds of experiences to which they are responding. The remaining five studies in this portion of this opinion are of this "controlled study" variety.

*The Zeisel Study*[59]

In the fall and winter of 1954-1955, Professor Hans Zeisel and two associates interviewed a number of jurors who had actually deliberated

---

over, a poorly controlled experiment may "mask" true differences between groups if the research design did not carefully isolate and account for all the independent variables that might affect the results.

[59]Zeisel, Some Data on Juror Attitudes Toward Capital Punishment (1968) (hereinafter, *Zeisel*).

on felony cases in the Criminal Court of Chicago, Illinois, or the County Court of Kings County (Brooklyn), New York. Zeisel's purpose was to explore whether the jurors' attitudes toward capital punishment correlated with a tendency to vote for guilt or acquittal in criminal cases. He asked the jurors whether they had any conscientious scruples against the death penalty[60] and how they had voted on the first ballot after the jury started to deliberate.

Asking only these two questions would have resulted in a wholly uncontrolled study, for in this posture, the factor of the strength of the evidence had not been taken into account. Zeisel devised a rather ingenious question to get at this factor. He concluded that the strength of the evidence in a given case could be roughly estimated and compared with other cases by determining how the jury as a whole voted on the first ballot after deliberations began. Thus, a first ballot vote of 11-to-1 in favor of acquittal suggested a weak case against the accused; a 10-to-2 vote for acquittal indicated a weak case but not quite so weak; a 9-to-3 vote for acquittal, an even less weak case; and so on, through all 11 possible jury splits, to 11-to-1 for conviction.[61] By grouping each juror's vote into one of the eleven categories or "constellations" based on the strength of the evidence—from the weakest prosecution evidence to the strongest—Zeisel could roughly control for the weight of the evidence.

Zeisel conducted his interviews in the jury assembly room on the last day of the jurors' terms of service. He and his associates interviewed as many jurors who actually sat on a case as possible. Some had deliberated on two cases. Most of the jurors contacted agreed to be interviewed. Zeisel ended up with data on 464 first ballot votes. These were classified according to the strength of the evidence, using the first ballot split as an index of this strength. He compiled the results into table form as follows:

---

[60]The data for the *Zeisel* study was gathered more than a decade before *Witherspoon* held that mere "conscientious scruples" against the imposition of capital punishment were insufficient to uphold a challenge for cause. Thus, the question Zeisel posed to his subjects regarding their views on capital punishment did not precisely correspond to the *Witherspoon* criteria. (But see, *post*, fns. 72 and 79.)

[61]Zeisel did not include in his analysis those situations where the jury was unanimous on the first ballot, either for acquittal or conviction. In those cases, differences in juror personalities were overwhelmed by the strength of the evidence. (Cf., *ante*, p. 25.)

## Results of *Zeisel* Study

Per Cent Distribution of First Ballot Votes of Jurors Without and With Scruples Against the Death Penalty in the 11 split voting constellations:
1 Guilty Vote, 2 Guilty Votes, . . . 11 Guilty Votes in percentages

Zeisel found that in 10 of the 11 constellations of evidence strength, jurors with conscientious scruples against capital punishment voted to acquit more often than jurors without such scruples. In 9 of the 11 constellations, jurors without such conscientious scruples voted to convict more often than jurors with scruples.[62]

Zeisel determined that these differences between the first ballot guilty votes of the jurors without conscientious scruples against capital punishment and the first ballot guilty votes of jurors with such scruples were statistically significant at the .04 level. (*Zeisel, supra*, at p. 32.)

[62]In one category (10-to-2 for acquittal), jurors without conscientious scruples against capital punishment voted for acquittal more often and conviction less often than did jurors with such scruples.

In another category (i.e., 6-to-6 first ballot splits), jurors without conscientious scruples against capital punishment voted for conviction slightly less often (37 percent to 38 percent) than did jurors with such scruples. They also voted for acquittal less often (33 percent to 46 percent). The explanation for this apparent inconsistency seems to be that in this category, jurors without conscientious scruples voted "undecided" more often than did jurors with scruples (30 percent to 16 percent).

At the hearing below, he elaborated on his findings. "Whatever the case is, if there is a split ballot, my statement is [that] jurors who have scruples against the death penalty as a group will have a lower percentage of guilty votes than jurors [who] have no scruples."[63]

*The Goldberg Study*[64]

Dr. Faye Goldberg (now Girsh) undertook a controlled study of the relationship between conviction proneness and attitudes toward capital punishment in 1966-1967. The subjects in this study were 200 undergraduate students enrolled in colleges in Atlanta, Georgia. One hundred of the students were white, one hundred were black. Eighty-four were female, one hundred sixteen were male.

The subject/jurors were given a written questionnaire, containing short (four or five sentence) descriptions of each of sixteen simulated criminal cases. The 16 cases depicted primarily murder charges, and all were "cases in which the death penalty could be given in most jurisdictions which [had] the death penalty." (*Goldberg, supra,* 5 Harv.Civ. Rights-Civ.Lib.L.Rev. at p. 59.)

The described cases varied in severity, heinousness, justification, and amount of evidence available. The subject/jurors were instructed to de-

---

[63]This court cited Dr. Zeisel's study in *People v. Sirhan* (1972) 7 Cal.3d 710, 747-749 [102 Cal.Rptr. 385, 497 P.2d 1121]. There, the defendant moved prior to his trial to hold an evidentiary hearing on the question of the exclusion of "scrupled" jurors. Defendant indicated he wished to call Dr. Zeisel as a witness. As his offer of proof, defendant stated Dr. Zeisel would testify concerning the study he made which resulted in the article now before this court. The trial court denied the request. On appeal this court found no error in the ruling. The court reasoned that the data to be offered by Zeisel at the hearing "was the same data that was analyzed in his preliminary manuscript, which was before the Supreme Court in *Witherspoon*." (*Id.*, at p. 749.)

It is difficult to give significant weight to this reasoning. In *Witherspoon*, the Supreme Court had before it only a "*preliminary*, unpublished *summary* of the *results* of [his] study" (391 U.S. at p. 517, fn. 10 [20 L.Ed.2d at p. 782]), not the data nor the analysis that underlay his conclusions, nor indeed his final conclusions themselves.

Dr. Zeisel did testify at the hearing below and he fully agreed that the Supreme Court had been justified in not giving weight to what fragments of his study were before it. However, the leap from the fragmentary nature of the "preliminary summary" to a conclusion that the final study itself was unpersuasive is a nonsequitur.

[64]Goldberg, *Toward Expansion of Witherspoon: Capital Scruples, Jury Bias, and Use of Psychological Data to Raise Presumptions in the Law* (1970) 5 Harv.Civ. Rights-Civ.Lib.L.Rev. 53 (hereinafter, *Goldberg*).

This study was undertaken in 1966 and 1967 but not published in final form until 1970. However, the Supreme Court had before it in *Witherspoon* an unpublished manuscript based on the 1966-1967 data. (391 U.S. at p. 517, fn. 10 [20 L.Ed.2d at p.

cide the issue of guilt or innocence on the basis of the evidence summarized in the written description; no descriptions of the law were given. The subject/jurors were told to decide which of the following four categories of guilt or innocence they felt was appropriate: guilty of first degree murder, guilty of a lesser offense, not guilty by reason of insanity, and not guilty for lack of evidence. In addition, as this study occurred prior to *Witherspoon*, the subject/jurors were asked, "Do you have conscientious scruples against the use of the death penalty?" (Cf., *post*, fns. 72, 79.)

Dr. Girsh found that subject/jurors without conscientious scruples against the death penalty voted "guilty" on some crimes (i.e., first degree murder or a lesser offense) in 75 percent of their votes, whereas subject/jurors with such scruples voted guilty in 69 percent. The 6 percent difference between the groups was found to be marginally significant. ($P = .08$.)

Dr. Girsh also found that subject/jurors with conscientious scruples voted "not guilty by reason of insanity" in 14 percent of the votes, compared with 9 percent for the subject/jurors without such scruples. This finding was statistically significant. ($P = .03$.)

Dr. Girsh concluded that her results "do tend to· corroborate the trends found" in the studies by Dr. Zeisel and Dr. Wilson (see *post*). (*Goldberg, supra*, 5 Harv.Civ. Rights-Civ.Lib.L.Rev. at p. 69.) As Dr. Girsh testified, her study did not employ "sophisticated methodology,"[65] but the purpose of her study was to "try[] to find out if there was any reason to believe that this relationship existed at all. ... [W]e were trying to first tap the most superficial level of the relationship to see if there was anything." Based on the data from her study, Dr. Girsh concluded "there may be a basis...to think that when people with conscientious scruples against the death penalty are removed from the jury ...the resulting juries [may be] more likely to convict."

---

782].) Apparently, this unpublished material consisted of "sections of the unpublished findings and a summary of the study...." (*Goldberg, supra*, at p. 57.)

[65]The primary weaknesses of the Goldberg study are its use of sparse written case descriptions and the lack of jury instructions. It can also be criticized for using college students as subjects. However, as will be seen, the differences observed in *Goldberg* do not disappear as the studies become more realistic or as the subjects are changed.

*The Wilson Study*[66]

The subjects of Wilson's study were 187 junior and senior college students at the University of Texas. They were given one-half page written descriptions of "the facts presented to the jury in five criminal court cases." (*Wilson, supra*, at p. 2; the written descriptions are set forth at pp. 10-12 of the study.) Four of these cases involved homicide charges, and one of the four (a robbery murder) involved two defendants. The fifth described case was a rape charge. Four of the case descriptions included brief jury instructions. The subject/jurors were asked to "assume that you are a member of the jury before whom each of these cases is being tried. . . . On the basis of these facts and your interpretation and evaluation of them, decide whether you feel the defendant is guilty or innocent and indicate your feelings on the answer sheet provided." (*Id.*, at p. 9.)

Wilson used the total number of guilty verdicts rendered by each subject/juror as "an index of [that juror's] tendency to say guilty." (*Id.*, at p. 2.) Thus, because one case involved two defendants, the maximum number of guilty or not guilty verdicts was six. Wilson then compared the percentage of guilty votes cast by the subject/jurors who indicated they had "conscientious scruples against the death penalty, or capital punishment, for crime" with the percentage of guilty votes cast by subject/jurors without such scruples. The results he reported are illustrated by the following graph.

WILSON STUDY Percent Voting Guilty (By no scruples/scruples)

---

66Wilson, Belief in Capital Punishment and Jury Performance (unpub. manuscript) (hereinafter, *Wilson*). Dr. Wilson did not testify at the hearing below. Apparently, all that is known of the methodology of his study is what is stated in the 14-page study itself.

Wilson found that a majority of both groups voted guilty on three or four occasions. However, 22 percent of the subject/jurors with conscientious scruples against the death penalty voted guilty on two or less occasions, as compared to only 9 percent of the subject/jurors without such scruples. At the other end of the spectrum, 30 percent of the jurors without conscientious scruples against capital punishment voted guilty in five or six cases, as compared to 17 percent of the jurors with such scruples. These results were statistically significant; the "p" value was less than .02.

As the testimony below indicated, the Wilson study, like *Goldberg*, was "certainly not a very sophisticated study." It had generally the same shortcomings as *Goldberg*. It was useful primarily to suggest there may be some "relationship between attitudes toward the death penalty and propensity to vote guilty in criminal cases."

*The Jurow Study*[67]

Professor Jurow undertook the first controlled experiment in the post-*Witherspoon* era. His subjects were 211 employees at a Sperry-Rand Corporation plant on Long Island, New York. Virtually all of these individuals were eligible for jury duty. One-third of the subjects had had prior jury service. The group was overwhelmingly white (98.6 percent), fairly well educated, and had a relatively high median family income.[68] Women constituted 26 percent of the subjects; Catholics nearly 50 percent; engineers 39 percent; and clerical workers and laborers 29 percent.

Jurow prepared two audiotapes of simulated criminal trials. A script was prepared for each case, which "attempt[ed] to weight the evidence as evenly as possible between acquittal and conviction." (*Jurow, supra*, 84 Harv.L.Rev. at p. 581.) The script included opening statements by the attorneys, witnesses' testimony, direct and cross-examination, arguments of counsel, and the judge's instructions to the jury. The audiotapes were pretested to insure that the evidence was appropriately balanced and that the recordings were realistic and did enhance listener involvement. (*Ibid.*)

---

[67]Jurow, *New Data on the Effect of a "Death Qualified" Jury on the Guilt Determination Process* (1971) 84 Harv.L.Rev. 567 (hereinafter, *Jurow*).

[68]Nevertheless, 32 percent had no college education and 29 percent had family incomes under $10,000.

The first audiotape lasted 33 minutes (case I). It involved "the murder of a liquor store proprietor during a holdup and the apprehension and trial of an ex-convict seen running from the vicinity of the store who denied any knowledge of the robbery and murder." (*Ibid.*) The second tape (case II) lasted 50 minutes. It portrayed "a narcotics addict charged with robbing, raping, and killing a college girl in her apartment." (*Ibid.*)[69] At the conclusion of each tape, the subject/jurors were given time to think about their verdict and mark a ballot. There were no deliberations by the subject/jurors as a group.

The attitudes of the subject/jurors toward capital punishment were determined on a five-part spectrum, closely corresponding to the spectrum portrayed on page 20, *ante*.[70] The percentage of guilty votes cast within each group can be depicted as follows:

*Corresponds to the "automatic life imprisonment" category.

[69]A more complete summary of both cases can be found in appendix G of *Jurow* (84 Harv.L.Rev. at pp. 607-611).

[70]Jurow called this five-part spectrum a "Capital Punishment Attitude Questionnaire" or "CPAQ." There were two parts to the CPAQ, part (A) and part (B). It is only part (B) that is involved in the present discussion.

Response 1 on the CPAQ(B) spectrum corresponds to the "automatic life imprisonment" group; response 2 to the "oppose death penalty" group; response 3 to the "indifferent" group; response 4 to the "favor death penalty" group; and response 5 to the "automatic death penalty" group. Responses 2-to-5 are "*Witherspoon*-qualified" jurors.

In both cases, Jurow found some tendency for an attitude favorable to capital punishment to correlate with a tendency to vote for conviction. In case I (the liquor store robbery-murder), this tendency was highly significant (the "p" value was less than .01); in case II, the tendency was at best marginally significant (the "p" value is greater than .05).

Petitioner has reorganized the *Jurow* data, to compare directly the percentage of guilty votes cast by the "automatic life imprisonment" category with the percentage of guilty votes cast by the remaining categories lumped together.[71] This reorganization has been graphed as follows:

JUROW STUDY

PERCENT VOTING GUILTY IN TWO CASES

(BY DEATH-QUALIFIED/EXCLUDABLE)

AVERAGE FOR BOTH CASES

52% Death-Qualified* 38% Excludable**

\* Subjects who chose CPAQ(B) response 2, 3, 4 or 5, at p. 599.

\*\* Subjects who chose CPAQ(B) response 1, at p. 599.

CASE I
44% Death-Qualified* 33% Excludable**

CASE II
60% Death-Qualified* 42% Excludable**

---

[71]The propriety of this comparison is the "crux" of the Attorney General's attack on petitioner's evidence. (Cf., *post*, at pp. 63-69.) Briefly stated, it is argued that the relevant comparison is *not* between the "automatic life imprisonment" group and the "*Witherspoon*-qualified" group. Rather, the "automatic death penalty" group, which is excluded for cause at a capital trial (*ante*, fn. 48), must be subtracted from the "*Witherspoon*-qualified" group. The Attorney General further claims that none of petitioner's studies have done this in a scientifically adequate manner. Thus, petitioner's evidence proves, at most, the wrong proposition.

*Jurow* represented a significant advance in the controlled studies in two respects. One, since his study followed *Witherspoon*, Jurow was able to ask his capital punishment questions in a manner precisely relevant to post-*Witherspoon* capital trials.[72] Two, Jurow used a method for presenting evidence to his subject/jurors (i.e., audiotapes) that was much closer to a real trial than were the written questionnaires employed in *Goldberg* and *Wilson*. In that regard, it can be expected that the differences reported in *Jurow* are probably a closer approximation to reality than are those reported by the other two studies.

*Jurow* is not a definitive controlled study, however. Its presentation of evidence involved only oral, not visual, stimuli. The subjects were drawn from a limited population. There were no group deliberations and there may have been little felt responsibility on the part of the subjects as compared to actual jurors sitting in a real trial.[73]

*The Harris 1971 Study*[74]

In 1971 the Harris Poll organization conducted a nationwide survey regarding capital punishment. The subjects of the study were 2,068 adults, who comprised a stratified sample of the adult population of the United States.[75] These subjects were given direct person-to-person interviews lasting about an hour. One portion of the interview involved a conviction-proneness study.

---

[72]Despite this change in wording, *Jurow* obtained results consistent with those reported by the pre-*Witherspoon* studies. This suggests that the exact wording of the capital punishment question is not so critical to the validity of the results, and should give us some confidence that the findings of the pre-*Witherspoon* studies are applicable in the post-*Witherspoon* world.

[73]Heretofore, this court has been "not willing to accept [Jurow's conclusions] as decisive" of the *Witherspoon* issue. (*People* v. *Murphy* (1972) 8 Cal.3d 349, 368 [105 Cal. Rptr. 138, 503 P.2d 594]; see also, *People* v. *Rhinehart* (1973) 9 Cal.3d 139, 155 [107 Cal.Rptr. 34, 507 P.2d 642].) This position represents the sound view that one study by itself can rarely justify altering constitutional practice.

Nevertheless, even the main prosecution witness at the evidentiary hearing below stated that "Professor Jurow did a decent attempt at improving the research in that field up to that time." Since *Jurow*, there have been several more studies done, and it seems wholly appropriate to consider *Jurow* along with the other studies in resolving the question now before the court.

[74]Louis Harris & Associates, Study No. 2016 (1971), reported in part in White, *The Constitutional Invalidity of Convictions Imposed by Death-Qualified Juries* (1973) 58 Cornell L. Rev. 1176 at page 1178, footnote 12, and pages 1185-1186. (Hereinafter, *Harris 1971*.)

[75]Use of a stratified sample enables the researcher to generalize from the relative proportions of groups within the study to the proportion of those groups in the population as a whole.

The subject/jurors were presented with a card containing certain instructions. The subject/jurors were told to assume that they were members of a jury in a criminal case and that they had to determine their verdicts from the evidence presented. They were instructed to keep three legal rules "in mind": the concept of proof beyond a reasonable doubt, the fact that the prosecution has the burden of proof, and the rule that the accused is not required to testify.

The subject/jurors were then presented detailed written descriptions of four criminal cases. These were referred to throughout the hearing below as the "typewriter robbery," the "manslaughter" case, the "assaulting an officer" case, and the "automobile larceny" case. The subject/jurors were provided with written legal definitions of the crimes for which each accused was on trial. They were told to use that definition in order to assess the accused's guilt or innocence.

The subject/jurors were also asked whether in a murder trial "there would be any situations in which you might vote for the death penalty, or do you think you could never vote for the death penalty, regardless of the circumstances?" This question differentiated the "automatic life imprisonment" group from the rest of the populace (i.e., the *Witherspoon qualified*" group, which in the chart below petitioner calls the "death qualified" jurors). (Cf., *ante*, fn. 71.) It was found that in all four of the cases presented, the "automatic life imprisonment" jurors (petitioner calls these the "excludables") voted to convict less often than did the remaining jurors. In three of the four cases, the differences were highly significant ("p" value less than .01) and in the fourth case, the difference was marginally significant ("p" value less than .10). Combining each groups' votes across all four cases revealed an overall difference of 7 percent in the frequency with which these groups voted to convict. These results are portrayed below.

1971 HARRIS POLL
PERCENT VOTING GUILTY IN FOUR CASES
(BY DEATH-QUALIFIED/EXCLUDABLE)
AVERAGE FOR ALL CASES

63% Death-Qualified 56% Excludable

CASE 1: Typewriter Robbery — 66% Death-Qualified, 57% Excludable

CASE 2: Manslaughter — 74% Death-Qualified, 67% Excludable

CASE 3: Assaulting an Officer — 39% Death-Qualified, 32% Excludable

CASE 4: Automobile Larceny — 73% Death-Qualified, 69% Excludable

*The Ellsworth Conviction-Proneness Study*[76]

The most recent controlled study of conviction-proneness was undertaken in 1979 by Drs. Phoebe Ellsworth, William Thompson, and Claudia Cowan. They recruited as subjects 288 adults eligible for jury service in California. Of the group of 288, most (218) had responded to a local newspaper advertisement asking for volunteers for a study of "how juries make decisions;" 37 were recruited from the jury lists for Santa Clara County Superior Court after being discharged from further jury duty; and 33 were friends of other persons who participated as subjects in the experiment. Forty-five percent of the subjects had had prior jury service.

The subject/jurors participated in the study in groups of 12 to 36. They were shown a two-and-one-half-hour videotaped reenactment of an actual criminal trial. The videotape had been developed by Harvard Professor Reid Hastie for use in his studies of nonunanimous jury verdicts. Hastie based the tape on an actual trial in Massachusetts, although it was not a scripted reenactment of that trial but a spontaneous one. The actors in the tape had been provided with a transcript of the actual trial and other relevant materials. The "prosecutor" and "defense counsel" were told to conduct the case as they saw fit, and the "witnesses" themselves were to testify as closely as possible to the "real" testimony in the transcript. The role of the district attorney was played by a local prosecutor. The defense counsel was a defense attorney in private practice. The judge presiding over the trial was a Massachusetts judge and the role of the police officer witness was played by a recently retired policeman. Ellsworth altered the Hastie tape somewhat. Since the judge in the Hastie tape gave jury instructions based on Massachusetts law, that portion of the videotape was recreated with a law school dean acting as judge and giving CALJIC instructions.

After this videotape had been played, each subject/juror was asked to indicate how he or she would vote, based upon his or her "own personal individual decision." There were four possible verdicts: guilty of first degree murder, guilty of second degree murder, guilty of voluntary manslaughter, and not guilty by reason of self-defense or excusable homicide.

---

[76]Ellsworth et al., Juror Attitudes and Conviction Proneness: The Relationship between Attitudes towards the Death Penalty and Predisposition to Convict (1979, prepub. draft) (hereinafter, the *Ellsworth Conviction-Proneness Study*).

The subjects' views on capital punishment had been previously determined. Of the 288 persons participating in the experiment, 30 were "guilt phase includables" and 258 were "*Witherspoon*-qualified" (i.e., persons who could impose the death penalty in at least some circumstances).[77]

The results of the *Ellsworth Conviction-Proneness Study* are tabulated below:

Ellsworth Conviction-Proneness Study:
Juror Voting Behavior, Comparison of
"*Witherspoon*-Qualified" and "Guilt Phase
Includable" Jurors

| Verdict | "Guilt Phase Includable" Jurors | "*Witherspoon*-Qualified" Jurors |
|---|---|---|
| First Degree Murder | 3.3% (1) | 7.8% (20) |
| Second Degree Murder | 23.3% (7) | 21.3% (55) |
| Manslaughter | 26.7% (8) | 48.9% (126) |
| Acquittal | 46.7% (14) | 22.1% (57) |
| | 100% (30) | 100% (258) |

These results, Ellsworth concluded, "provide strong support for the hypothesis that death qualified jurors are more likely to convict than are jurors excludable under the Witherspoon criteria. The most direct test of this hypothesis is a comparison of the relative proportion of guilty and not guilty verdicts among the two groups of jurors. Among the [*Witherspoon*] qualified jurors, 22.1% voted not guilty while 77.9% found the defendant guilty of some level of homicide. Among the [guilt phase excludable] jurors, 46.7% voted not guilty, and 53.3% voted guilty of some offense. This difference is highly significant ['p' value of less than .01] and indicates that the departure from representativeness created by the process of restricting juries in capital cases to [*Witherspoon*] qualified jurors only may have important negative consequences for defendants in death penalty trials." (*Ellsworth Conviction-Proneness Study, supra*, at p. 7.)[78]

---

[77]None of the 288 was a "guilt phase nullifier," since Professor Ellsworth had excluded from the study all persons who identified themselves as having doubts against capital punishment that would prevent them from being fair and impartial on the issue of guilt.

[78]After indicating their personal decisions on guilt, most of the jurors were grouped into juries of 12 and instructed to try to reach a unanimous verdict. The deliberations

Using a statistical process known as multiple regression analysis, Ellsworth also analyzed the data to determine whether the differences in the jurors' voting behavior could be attributable to factors other than differences in the jurors' attitudes toward capital punishment. She found that *none* of the other factors examined—prior jury service, age, sex, and source from which the subjects were recruited (i.e., newspaper advertisement or venire list)—correlated with voting behavior.

Of the Ellsworth conviction-proneness study, Professor Zeisel testified, "this study, with respect to its stimulus, comes as close to the ideal experiment as one can ever come.... There's no way of doing it better."

### OVERVIEW OF CONVICTION-PRONENESS STUDIES

The expert witnesses called on behalf of the defense testified that the studies convincingly established a strong correlation between the tendencies of jurors to vote for conviction and juror attitudes toward capital punishment. Dr. Zeisel noted "the almost monotony of the results [which are] obviously the same whether you take the experiment at Sperry-Rand in New York or students in Atlanta or jurors in Chicago or Brooklyn or eligible jurors here in [California]; it comes always out the same way.... And since all of the studies show the same result, no matter with whom, no matter with what stimulus, no matter with what closeness of simulation, there is really only one conclusion that we can come to. The relationship is so robust—and this is a term of art among scientists—that no matter how strongly or how weakly you try to discover it in terms of your experimental design, it will come through."

---

were halted after one hour; no jury had reached a verdict. The jurors were again asked for their personal verdicts at that time. The differences between the groups were still quite pronounced.

ELLSWORTH POST-DELIBERATION FOLLOW-UP DATA
Juror Voting Behavior, Comparison of "*Witherspoon-Qualified*" and "Guilt Phase Includable" Jurors on Post-Deliberation Ballot

| Verdict | "Guilt Phase Includable" Jurors | "*Witherspoon-Qualified*" Jurors |
|---|---|---|
| First Degree Murder | 3.4% (1) | 1.0% (2) |
| Second Degree Murder | 13.8% (4) | 17.3% (34) |
| Manslaughter | 48.3% (14) | 68.0% (134) |
| Acquittal | 34.5% (10) | 13.7% (27) |
| | 100% (29) | 100% (197) |

Drs. Ellsworth and Girsh reached similar conclusions. Ellsworth amplified her testimony by using a statistical technique that yields a single overall significance level for the combined results of the five conviction-proneness studies which had preceded hers. Combining the results from *Jurow's* case I with the other four studies produced an overall significance level of less than .00001 (i.e., a probability of less than 1 in 100,000 that the combined results of those studies could have been achieved through chance alone.)[79] Using the results from *Jurow's* case II, the overall significance level was less than .0005 (i.e., less than 1 in 2,000). Indeed, when Ellsworth combined only the *Jurow* and *Harris 1971* studies, which differentiated their subjects' views on capital punishment by use of questions based on the *Witherspoon* decision, she found that the overall significance level was less than .04 using *Jurow* case I and less than .009 using *Jurow* case II.

The prosecution has not sought either at the hearing below or in its briefs to adduce evidence that there is no correlation between conviction-proneness and attitudes toward capital punishment.[80] Rather, the main thrust of its position has been to attack the methodology of the studies relied upon by petitioner and to question the propriety of generalizing from the results of those studies to the constitutional conclusions which petitioner must prove. As the most significant critiques apply to virtually all of the studies, they will be discussed in the next section of this opinion.

---

[79]Obtaining an overall significance level for these six studies requires an inference that the results of the pre-*Witherspoon* studies (where jurors' voting behavior was differentiated on the basis of whether they had "conscientious scruples" against the death penalty) can be combined with the results of the post-*Witherspoon* studies (where the jurors have been differentiated on the basis of the stricter *Witherspoon* principles).

This inference appears to be a sound one. In general, "while the *absolute* response level may differ for...two questions [that are distinct 'in form but...go to the same substance and have therefore a common core'], the *relative* differences between population subgroups, or the relationship to other attitudes remain as a rule invariant to the form of questioning." (*Zeisel, supra,* at p. 13, fn. 16; citation omitted, original italics.) Comparison of the results of the studies using the pre-*Witherspoon* and post-*Witherspoon* questions suggests that this general rule is operating in the present context.

[80]There appears to be one study in which the authors did come to a conclusion opposite to that of the seven studies heretofore discussed. (Osser & Bernstein, *The Death-Oriented Jury Shall Live* (1968) 1 U. San Fernando Val.L.Rev. 253.) In this study, the law student authors looked at conviction rates in Los Angeles County Superior Court over a six-month period in 1967, when there was a death penalty law in effect in the state. It found that juries "convicted" in "first degree murder" cases less often than did juries in burglary and robbery cases..

This study was criticized by both defense and prosecution experts. Dr. Zeisel called the study "incompetent" and of "no probative value whatsoever" because its authors

For present purposes, it should be noted that the prosecution did call two expert witnesses at the hearing below to raise methodological criticisms of some of the studies. The primary expert for the prosecution, Dr. Thomas Haines, discussed the *Goldberg, Jurow, Harris 1971*, and *Ellsworth Conviction-Proneness* studies. He concluded his direct examination by testifying that "there is a tendency or direction indicated here [i.e., in the studies]" but that "if this is in fact the sum total of the data to present the argument, I would have to say that it is definitely very tentative and fragmentary. . . ." He later explained that "basically my criticism is that [the studies in their written form] do not give me enough information" as to the procedures used. He had not been present for nor given a transcript of the testimony of the defense experts at the evidentiary hearing, and he conceded that this testimony could have answered the methodological concerns he raised.

Haines did note that the various studies "all point in the same direction. . . . There is some relationship, apparently." He agreed that "as the stud[ies] get methodologically better the effect that they are finding doesn't go away. . . . [T]he better study [e.g., the *Ellsworth Conviction-Proneness Study*] is not producing a weaker finding. . . ."

The second expert witness called by the prosecution was Dr. Gerald Shure, who discussed only one of the conviction-proneness studies, Ellsworth's. As to this study, he stated that "the evidence presented suggests that in fact a death-qualified juror is likely to be more biased in certain respects [particularly] [a]t the level of attitudes. . . ."[81] He felt that the study could not "predict . . . the actual behavior of jurors *in specific cases* . . . ." (Italics added.) That, of course, is not the issue. (Cf., *ante*, fn. 57.)

---

failed to control for the variable of the weight of the evidence. In addition, the authors apparently made no attempt to determine how many of the juries in murder cases were in fact death qualified. They did not indicate how they determined which murder prosecutions were for "first degree" murder (at that time, the charging information did not need to specify whether the murder alleged was of the first or second degree). They did not indicate whether they classified convictions for necessarily included offenses as "convictions" or as "acquittals" under their scheme. As one other court has noted, "[t]oo many other causative factors are obviously operating in the situations compared" to entitle this study to any weight. (*Grigsby* v. *Mabry, supra*, 483 F.Supp. at p. 1388.) This court agrees.

[81] It is difficult to know what Dr. Shure meant when he used the phrase "at the level of attitudes." The *Ellsworth Conviction-Proneness Study* measured behavior, not attitudes. Perhaps Dr. Shure was confusing this study with the *Ellsworth Attitude Survey*, which is discussed below.

## THE ATTITUDE SURVEYS

■ The several attitude surveys introduced below are relevant on both the *Witherspoon* and *Ballew* issues insofar as those surveys may show that persons who differ in their attitudes toward capital punishment also differ in other attitudes related to the criminal justice system. Such a showing would reinforce our confidence in the conviction-proneness studies' findings of a relationship between attitudes toward the death penalty and conviction proneness, since it would reasonably be anticipated that persons who differ on both capital punishment attitudes and voting behavior would also differ with respect to a number of other, related attitudes. In addition, a showing that the attitudes of persons excluded from a capital jury differ from those of persons who serve would be relevant to the *Ballew* issue by showing that the exclusion tends to reduce "the presence of minority viewpoint[s]" on the jury. (435 U.S. at p. 236 [55 L.Ed.2d at p. 244].)

### *The Wilson Survey*

In addition to directly studying conviction proneness (*ante*, at pp. 32-33), Wilson also presented his subject/jurors with seven statements regarding the insanity defense[82] and asked them to indicate whether they agreed or disagreed. The number of "agree" responses was used to measure "the tendency to be biased against insanity as a defense plea." (*Wilson, supra*, at p. 3.) Wilson reported that 65 percent of the subjects with scruples against capital punishment agreed with 0, 1, or 2 of the statements, compared with 53 percent of the subjects without such scruples. These results were marginally significant.

### *The Bronson-Colorado Survey*[83]

About 1967, Professor Edward Bronson surveyed 718 persons drawn from jury lists in 8 Colorado counties. Half of these persons were inter-

---

[82]Only two of the seven questions are currently known. One is, "If I were a member of a jury, I could never vote 'not guilty' for a man whose defense was insanity." The other is, "The plea of 'not guilty by reason of insanity' is a loophole that allows many criminals to escape punishment." (*Wilson, supra*, at p. 3.)

One methodological problem with the *Wilson* survey is that all "agree"-responses tended to indicate a dislike for the insanity defense and all "disagree"-responses a favoring of the defense. A survey respondent noticing this uniform pattern may tend simply to continue with the trend of his earlier answers rather than focusing on the content of the statements confronting him. This is known in the literature as the problem of "response set."

[83]Bronson, *On the Conviction Proneness and Representativeness of the Death-Qualified Jury: An Empirical Study of Colorado Veniremen* (1970) 42 U. Colo. L.Rev. 1.

viewed in person, the balance over the phone. These subject/jurors were asked to "agree" or "disagree" with five statements related to crime and the criminal justice system.[84] The number of "agree"-responses was used as a measure of the tendency to favor the prosecution. (Note the "response set' problem. Cf., *ante*, fn. 82.)

Bronson also asked each respondent to indicate whether he or she strongly favored, favored, opposed, or strongly opposed capital punishment. He found that the number of "agree"-responses differed for each of the four capital punishment groups and that the amount of agreement tended to increase as support for the death penalty increased. This pattern of responses was statistically significant at the .01 level or less. In an attempt to determine what effect this had on the representation of attitudes on capital juries, Bronson compared the responses of the "strongly opposed" group—which he postulated was a *Witherspoon*-excludable group—with the combined responses of the remaining three groups. On all of the five questions, the "strongly opposed" group gave fewer "prosecution prone" responses than did the others. The differences between the groups ranged from 6 percent on question 2 to 30 percent on question 3. The results are graphed below.

BRONSON—COLORADO STUDY Responses to Each Attitudinal Question
(By attitude toward death penalty—those strongly opposed compared with all others)

[84]"1) If the police have arrested an individual and the district attorney has brought him to trial, there is good reason to believe that the man on trial is guilty.

"2) If the person on trial does not testify at his trial, there is good reason to believe that he is concealing guilt.

"3) Concerning the high level of violent crime in ghetto areas, this level of violent crime could be reduced if the courts would convict alleged law-breakers more often.

"4) The courts are far too technical in protecting the so-called constitutional rights of those involved in criminal activity.

"5) The plea of insanity is a loophole allowing too many guilty men to go free."

*The Harris 1971 Survey*

In addition to measuring conviction proneness by obtaining votes in four specified cases, the *Harris 1971* study also asked its subject/jurors to respond to a large number of questions or statements about crime and the criminal justice system. The responses of the "automatic life imprisonment" subjects were then compared to the remaining (i.e., "*Witherspoon*-qualified") subjects.

A majority of both groups of subjects agreed that "in most cases the jury should ignore a defense of insanity because it is a loophole that allows too many guilty people to go free." However, as in *Goldberg, Wilson*, and *Bronson-Colorado*, more of the "*Witherspoon*-qualified" subjects agreed than did the "automatic life imprisonment" subjects (67 percent to 57 percent). This difference was highly significant, with a "p" value of less than .01.

Similarly, while a majority of both groups believed there was less "law and order in this country" compared with five years earlier, the "*Witherspoon*-qualified" subjects were more likely to hold that belief (74 percent to 61 percent). They were also more likely to view blacks (39 percent to 30 percent) and the courts (34 percent to 19 percent) as "major cause[s]" of the "breakdown in law and order in this country."[85] Again, these results were all significant at the .01 level.

The two groups differed little in their evaluations of judges in criminal cases,[86] but there were consistent and statistically significant differences in their respective attitudes towards the lawyers. Prosecutors tended to fare better in the eyes of both groups than did defense coun-

---

[85]More "*Witherspoon*-qualified" subjects than "automatic life imprisonment" subjects agreed that "Negroes tend to breed crime more than white people" (41 percent to 31 percent), that "many Negroes and other minority groups just want a handout and do not want to work" (74 percent to 63 percent), and that black militant groups are "a major cause" in the breakdown of law and order (68 percent to 48 percent).

[86]Of eight questions asked concerning judges in the criminal trials, the two groups differed to a statistically significant degree on only two: "Judges are usually more favorable to the prosecution than they are to the defense" and "Most judges would rather sentence a convicted man to a long prison term than put him on probation."

A plurality of both groups disagreed with these statements, but the "automatic life imprisonment" group was less likely to disagree than the "*Witherspoon*-qualified" group (about 43 percent to 54 percent). This difference was statistically significant.

sel. However, the "automatic life imprisonment" group saw the gap as considerably smaller than did the "*Witherspoon*-qualified" group.[87]

Finally, the subjects were asked about the attitudes concerning nine trial occurrences. These inquiries were prefaced with the following instructions: "Suppose you were a juror in a criminal case, and the judge told you that the prosecution must prove the defendant guilty beyond a reasonable doubt, otherwise the jury should find the defendant innocent. If the case involved each of the situations I am going to read to you how difficult would it be for you to vote 'not guilty?'" Examples of the "situations" to which responses were elicited are: "If the defendant does not take the witness stand in his own defense"; "If an aide to the judge claimed he knew the defendant had committed the crime although the judge said the jury should ignore such statements;" and "If a policeman testified that he saw the defendant commit the crime."[88] The subjects were then asked to indicate whether they would "certainly find [defendant] innocent," "probably find [defendant] innocent," "not find [defendant] innocent" or were "not sure."

In each of the nine situations presented to the subjects, the "*Witherspoon*-qualified" group was more likely to give a "not innocent"-response than was the "automatic life imprisonment" group. Conversely,

---

[87]Thus, the "*Witherspoon*-qualified" subjects were more likely than the "automatic life imprisonment" subjects to select the prosecutor as "honest and straightforward," "genuinely interested in presenting all the facts," "more concerned about the best interests of society," and "more interested in a fair trial than in winning." Conversely, the "*Witherspoon*-qualified" subjects were more likely to select defense counsel as the attorney "ready to make deals with the other side," "likely to use emotional rather than factual arguments," and "better skilled at playing tricks in the courtroom than in seeking justice."

For the "automatic life imprisonment" group, the gap between prosecutor and defense counsel was narrower by an average of 13 percent than it was for the "*Witherspoon*-qualified" group. These differences in group attitudes were all significant, generally at the .01 level.

[88]These were the first three situations presented to the subjects. The remaining six were:

(4) "If the defense presents no witnesses to prove the prosecution wrong";

(5) "If the prosecution made it pretty clear the defendant lied in part of his testimony";

(6) "If the defendant made a confession but the judge wouldn't let it be introduced because the defendant had no lawyer there when he made it";

(7) "If the defendant admits he committed the crime, but brings in two psychiatrists who say that he was insane when he committed the crime";

(8) "If the facts proved that the defendant was at the scene of the crime"; and

(9) "If you had read a newspaper article saying that the defendant had actually committed the crime although the judge said to ignore this information."

in seven of the nine situations, the "automatic life imprisonment" subjects were more likely to give "innocent"-responses.[89] If the percentage of innocent responses is subtracted from the percentage of not innocent responses in order to calculate a "net pro-guilty" response, it is found that the *Witherspoon*-qualified" subjects had higher "net pro-guilty" responses on eight of the nine "situations." In all eight, the "p" values were .05 or lower.[90]

*The Bronson-California Surveys*[91]

Professor Bronson, who had earlier conducted a survey of jurors in Colorado (cf., *ante*, pp. 43-44), was interested in seeing whether the results of that survey could be replicated in California. He, therefore, conducted two similar surveys in this state, the first in Butte County in 1969-1970 and the second in Los Angeles, Sacramento, and Stockton in 1974-1975. These surveys were administered by students over the telephone except in Los Angeles. There, the jury commissioner handed out Bronson's questionnaire.

The Butte County survey involved 755 persons on the jury list of a small, relatively homogeneous, rural county. (*Bronson-California, supra*, at p. 12.) The jurors were given substantially the same five questions as in the *Bronson-Colorado* survey.[92] In addition, Bronson added two new questions to the survey.[93] As in *Bronson-Colorado*, an "agree" answer was used as a measure of the tendency to favor the prosecution.

Bronson found that on each question the percentage of "agree" responses increased as the jurors' approval of the death penalty increased.

---

[89]The groups gave equal proportions of "innocent" responses to situation 8. On situation 9, the *"Witherspoon*-qualified" group gave a slightly higher percentage of "innocent" (and "not innocent") responses. (This apparent inconsistency is due to the fact that the *"Witherspoon*-qualified" group was less likely to respond "not sure" than was the "automatic life imprisonment" group.)

[90]Indeed, the differences on seven of the situations (i.e., situations 1-7) were significant at the .01 level or lower. On situation 9, there were no net differences between the groups.

[91]Bronson, The Exclusion of Scrupled Jurors in Capital Cases: The California Evidence on Conviction Proneness and Representativeness (unpub. discussion paper).

[92]There was still a problem with "response set." (Cf.. *ante,* at p. 43, fn. 82.)

[93]They were: "If the facts in a trial are not clear, then jurors should believe the prosecuting attorney more often than the defense attorney, since defense attorneys are only interested in protecting their clients at all costs" and "During a riot the government should have absolute power to jail suspicious persons without trial or bail."

As in *Bronson-Colorado*, Professor Bronson again compared the responses of the group "strongly opposed" to the death penalty with the combined responses of the remaining groups.[94] On all seven of the questions, the "strongly opposed" group gave fewer "agree" responses than did the others. The differences ranged from 16 percent on question 6 to 52 percent on question 3. The results are graphed below.

BRONSON—BUTTE COUNTY STUDY
Responses to Each Attitudinal Question
(By attitude toward death penalty—those strongly opposed compared with all others)

[94]Bronson tested what he called "the intuitively obvious proposition" that the jurors in the "strongly opposed" category were also those whom *Witherspoon* would allow to be excluded as "automatic life imprisonment" jurors. In 1971 Bronson did a follow-up study of jurors in Butte County and asked their views on the death penalty. Of those who responded that they were "opposed" or "strongly opposed" to it, he asked an "automatic life imprisonment" question based on *Witherspoon*. He found that of the 40 persons "strongly opposed" to capital punishment, 37 (or 93 percent) said they would vote automatically against the death penalty. Two subjects said they were not sure and one person answered "no." He thought this was "strong empirical evidence" to support his initial hypothesis. (*Bronson-California, supra*, at pp. 5-7.)

The Los Angeles-Sacramento-Stockton portion of the survey involved 707 jurors and 7 questions. Four of the questions were identical to those asked in the Butte County survey; two questions were reworded in an attempt to overcome problems of "response set" (questions 2 and 6); and a new question was substituted for question 7 of the Butte County survey.[95]

The responses to four of the seven questions showed a statistically significant relationship between support for capital punishment and the number of pro-prosecution responses. ("P" values of less than .001.) The differences among the groups on the remaining three questions (numbers 2, 6, and 7) were not statistically significant.[96] The chart below reflects Bronson's comparison of the pro-prosecution responses of the "strongly opposed" group with the combined pro-prosecution responses of the remaining groups:

BRONSON—LOS ANGELES, SACRAMENTO, STOCKTON STUDY
Responses to Each Attitudinal Question (By attitude toward death penalty—those strongly opposed compared with all others)

[95]The new question was: "It is better that ten guilty men go free than one innocent man be convicted."

[96]Bronson attributed these latter results to poorly conceived questions.

*The Ellsworth Attitude Survey*[97]

The final attitude survey was conducted in April 1979 in Alameda County. The subjects were 811 persons randomly selected from the adult population of the county. All participants were registered to vote in the county or had a California driver's license; all lived in a household with an operational telephone.

The survey questionnaire was prepared by Drs. Ellsworth and Fitzgerald. The questions were pretested to insure that "the questions were comprehensible and the responses were sufficiently variable so that meaningful between-group comparisons would be possible." (*Id.*, at p. 3.) The survey was administered by the Field Research Corporation (FRC). The subjects were selected by FRC using a process known as random digit dialing, and the interviews were conducted by experienced professional interviewers at FRC. The methodology of this survey was universally praised by the experts below. The prosecution experts called it "very well done," "an excellent job," and "far better in quality" than earlier surveys such as Bronson's. The results of this study were considered representative of the above-delineated adult population of Alameda County.

The survey asked questions concerning the subjects' attitudes toward capital punishment. (*Ellsworth Attitude Survey, supra,* appen. I, p. 2.) Of the 811 subjects participating, 73 indicated that their opposition to the death penalty would preclude them from being fair and impartial at the guilt phase (i.e., these 73 were "guilt phase nullifiers"); 21 more subjects gave no answer on the nullification question. These two sets of subjects apparently did complete the interview procedure. However, since petitioner does not quarrel with the exclusion of these persons from the guilt phase of a capital trial, their responses are excluded in the results reported in this survey. Thus, the total sample size was 717 subjects, and Ellsworth was able to compare directly the "guilt phase includable" jurors with the "*Witherspoon*-qualified" jurors.[98]

The subjects were asked 13 attitudinal questions. There were statistically significant differences between the "guilt phase includable" subjects and the "*Witherspoon*-qualified" subjects on 11 of them.

---

[97] Ellsworth & Fitzgerald, Due Process vs. Crime Control: The Impact of Death Qualification on Jury Attitudes (1979, prepublication draft).

[98] Of the 717 subjects remaining in the survey, 17.2 percent were "guilt phase includable" and 82.8 percent were "*Witherspoon*-qualified." (*Ellsworth Attitude Survey, supra,* p. 5.)

The subjects were asked initially whether unemployment or violent crime was the more serious problem for Alameda County residents. A significant majority of the *"Witherspoon*-qualified" subjects (62.5 percent) chose "violent crime," while a slight majority of the "guilt phase includables" (50.4 percent) selected unemployment. (P = .01.)

As in many of the previous surveys, there was a majority of both groups who viewed the insanity defense as "a loophole allowing too many guilty people to go free," but the majority was much larger for the *"Witherspoon*-qualified" jurors (78 percent) than for the "guilt phase includable" group (59.2 percent). (P < .001.)

The subjects were asked to agree or disagree with the statement "It is better for society to let some guilty people go free than to risk convicting an innocent person." A majority of the "guilt phase includable" group (62.5 percent) *agreed*, whereas a majority of the *"Witherspoon*-qualified" group *disagreed* (56.1 percent). The table below sets forth these results, which are significant at a level less than .001:

ELLSWORTH/FITZGERALD 1979 ALAMEDA COUNTY SURVEY

2. a. Better Some Guilty Go Free

"It is better for society to let some guilty people go free than to risk convicting an innocent person."

$X^2_{th} = 21.5, p < .001$

Differences in attitudes toward the privileges against self-incrimination were measured in two questions. About one-third of the "*Witherspoon*-qualified" subjects (32.3 percent) indicated agreement with the statement "A person on trial who doesn't take the witness stand and deny the crime is probably guilty." Only 23.5 percent of the "guilt phase includables" agreed. (P < .006.) In a related item, subjects were told that "a principle of law that you would have to follow if you were a juror in a criminal trial" is the rule that "if the defendant does not testify, this should not be treated as showing guilt." They were asked to indicate whether they agreed or disagreed with this principle. Twenty-four percent of the "*Witherspoon*-qualified" subjects disagreed with it, compared to 14.0 percent of the "guilt phase includable" subjects. (P < .02.)

The two groups also indicated sharp divergences in their attitudes toward the statement that "Even the worst criminal should be considered for mercy." The "*Witherspoon*-qualified" subjects indicated overall *disagreement* with the statement (56.0 percent), whereas a large majority of "guilt phase includables" *agreed* (77.8 percent). (P < .001.) On a somewhat related proposition—i.e., "Harsher treatment of criminals is not the solution to the crime problem"—20 percent of the "guilt phase includable" subjects disagreed, compared with 41.0 percent of the "*Witherspoon*-qualified" group. The pattern of attitudinal differences was significant at better than a .001 level.[99]

The subjects were also asked to "suppose you're a juror in a criminal trial.... From the newspaper and television stories you have seen you know that the defendant made a confession to the crime. But the confession isn't presented during the trial. The judge instructs you that you must make your decision about guilt or innocence only on the evidence you heard during the trial. Without the confession the prosecution's case is weak; it would not convince you beyond a reasonable doubt of the defendant's guilt. In reaching your verdict what would you do?" A majority of the "guilt phase includable" subjects (60.2 percent) indicat-

[99]There were no significant differences in the two groups' responses to the proposition "A person would not be brought to trial unless he or she were guilty of a crime." Large majorities of both groups (73.6 percent and 67.6 percent) disagreed, with the "guilt phase includables" expressing the slightly greater disagreement.

However, there were statistically significant differences (p < .003) in the pattern of responses to the statement "All laws should be strictly enforced, no matter what the results." A majority of the "*Witherspoon*-qualified" subjects (57.1 percent) *agreed* with the statement, but most of the "guilt phase includable" subjects (53.7 percent) *disagreed.*

ed they would not consider the confession, whereas a slight majority of the "*Witherspoon*-qualified" subjects indicated they "would take the confession into consideration." (P < .04.)

Finally, the survey dealt with the attitudes toward counsel at a criminal trial. The results were similar to those in *Harris 1971*. In separate questions, the subjects were asked to agree or disagree with the statement that "defense attorneys [or district attorneys] have to be watched carefully, since they will use any means they can to get their clients off [or get convictions]." The results are tabulated below. A majority of "guilt phase includable" subjects agreed that both the district attorney (53.1 percent) and the defense counsel (64.7 percent) must "be watched carefully." However, whereas only 48.9 percent of the "*Witherspoon*-qualified" subjects agreed as to the district attorney, nearly three-quarters (73.5 percent) believed that defense counsel must be watched carefully.

ELLSWORTH/FITZGERALD 1979 ALAMEDA COUNTY SURVEY

ATTITUDES TOWARD THE DISTRICT ATTORNEY AND THE DEFENSE ATTORNEY

Ellsworth sought to combine the results from all 13 questions into one "general index of prosecution-proneness."[100] In doing so, she computed that there was a difference of about 12 percent in the proportion of pro-prosecution attitudes between the "*Witherspoon*-qualified" group and the "guilt phase includable" group. This overall difference was statistically significant (p < .0001), and indicated that the former group was "significantly more prosecution-prone" than the latter.

### DEMOGRAPHIC CHARACTERISTICS

■ There has long been survey research done which related attitudes towards capital punishment to such demographic characteristics as race and sex. This research is relevant to the *Ballew* issue in the present case insofar as it may show that excluding persons based upon their opposition to capital punishment "foretells problems...for the representation [on juries] of minority groups in the community." (*Ballew* v. *Georgia, supra,* 435 U.S. at p. 236 [55 L.Ed.2d at p. 244].)

*Sex*

Surveys conducted over the past 30 years by Gallup, Harris, and the National Opinion Research Center (N.O.R.C.) have uniformly shown that women are opposed to capital punishment more frequently than are men. From 1953 through 1978, Gallup and N.O.R.C. conducted nationwide polls asking the survey respondents, "Are you in favor of the death penalty for persons convicted of murder?" As the graph below indicates, there have been consistent differences between the responses of men and those of women, with women expressing opposition to the death penalty more often (by an average of 11 percent).

---

[100]"Each respondent was scored on a scale ranging from 3 to 36, where a score of 36 represented the largest possible number of pro-prosecution responses to the attitudinal statements. On the three statements with two response choices, each response was given a score of 1 or 2, with the score of 2 assigned to the pro-prosecution response. On the ten statements with four response choices, each response was given a score of 0, 1, 2 or 3, with the score of 3 assigned to the strongest possible pro-prosecution response to each statement. The index...is the sum of the scores for all thirteen attitudinal statements."

PROPORTION OF MALES AND FEMALES FAVORING THE DEATH PENALTY

Harris polls conducted in 1973 and 1977 found similar disparities in persons' responses to the question "Do you believe in capital punishment (death penalty) or are you opposed to it?" The 1973 poll found that women expressed opposition 7 percent more often than men (35 percent to 28 percent); in 1977, the gap was 9 percent (29 percent to 20 percent).

These differences between the sexes do not disappear when the question posed is tailored to the *Witherspoon* criteria. The *Harris 1971* survey asked, "Suppose you were a juror in a murder trial and it was completely up to the jury to choose whether the penalty would be death or imprisonment, do you think there would be any situations in which you might vote for the death penalty or do you think you could never vote for the death penalty, regardless of the circumstances?" In response to this question, 37 percent of the women indicated they could never vote for the death penalty, compared to 24 percent of the men.

Similarly, the *Ellsworth Attitude Survey* asked, "Is your attitude toward the death penalty such that as a juror you would never be willing

to impose it in any case, no matter what the evidence was, or would you consider voting to impose it in at least some cases?" Twenty-one percent of the women and only 13 percent of the men responded they would be unwilling to impose the death penalty in any case. (P = .01.)

*Race*

The disparities between whites and blacks is even greater than between males and females. As the chart below shows, Gallup and N.O.R.C. polls during 1953 through 1978 have shown that blacks are much more opposed to capital punishment than are whites. The average difference in opposition to capital punishment over the entire 25-year period is 23 percent, but the gap has been increasing (it averaged 28 percent in the 1970s).

PROPORTION OF WHITES AND BLACKS FAVORING THE DEATH PENALTY

(NATIONAL OPINION POLLS)
["Don't Knows" Excluded]

Whites
Blacks

G = Gallup
N' = N.O.R.C. (from Smith)
N = N.O.R.C.

Harris polls in 1973 and 1977 are consistent with the Gallup and N.O.R.C. data, finding disparities of 21 percent (50 percent to 29 percent) and 26 percent (48 percent to 22 percent) respectively.

As was true for the sexual differences, the significant disparities remain when a *Witherspoon* question is posed. The *Harris 1971* survey found that 46 percent of blacks indicated they "could never vote for the death penalty, regardless of the circumstances," whereas only 29 percent of whites so responded. (P < .01.) The *Ellsworth Attitude Survey* reported that 17 percent of the whites in Alameda County, but 26 percent of the blacks, stated they "would never be willing to impose [the death penalty] in any case, no matter what the evidence was." (P = .05.)

As the evidence adduced below established, these correlations between opposition to capital punishment and racial and sexual characteristics "have tended to appear with boring regularity ever since these topics have been researched...." "No one who has ever done [such] a survey...has failed to find" these differences.

### Juror Evaluation of Evidence

While the conviction-proneness studies (*ante*, pp. 27-42) may indicate that "guilt phase includable" jurors will tend to differ in their decisions on guilt or innocence from "*Witherspoon*-qualified" jurors, they do not themselves directly explain how these differing conclusions come about. Some inferences as to how this occurs may be drawn from the attitude[101] and demographic[102] surveys. In the evidentiary hearing below, three studies by Ellsworth were used to suggest some "possible mechanism[s] by which these attitude[ ] [differences] might translate into the relevant behavior."

One study, referred to below as the *Ellsworth Post-Deliberation Follow-up Study*, sought to measure the differences in jurors' thresh-

---

[101]For example, if a juror strongly disagreed with the statement "It is better for society to let some guilty people go free than to risk convicting an innocent person," it would appear that he or she would worry less about an erroneous guilty verdict than would a juror who strongly agrees with that statement. Such a lower level of concern would likely be linked to a lower threshold of reasonable doubt, i.e., it would probably take somewhat less evidence to obtain a guilty verdict from a "strong disagree" juror than from a "strong agree" juror.

[102]As this court noted in *People* v. *Wheeler, supra,* 22 Cal.3d at pages 276-277, footnote 17, blacks may be more inclined to acquit than whites because of their "'differing attitudes toward the administration of justice and the nature of criminal offenses'" such as "'sympathy for the economic or social circumstances of the defendant, a feeling that criminal sanctions are frequently too harshly applied, or simply an understandable suspicion of the operations of government.'" (Quoting from Note (1977) 86 Yale L.J. 1715, 1733, fn. 77.)

olds of reasonable doubt by measuring the regret they might feel if they returned an erroneous verdict (either conviction or acquittal) in a criminal case. (Cf., *ante*, fn. 101.) The subjects in this study were all persons eligible for jury service in California. Fourteen were "guilt phase includable" and fifteen were "*Witherspoon*-qualified." The subjects were asked to imagine that they had actually served on a jury in a homicide case, that the jury had reached a unanimous verdict, and that they later learned that the verdict was wrong. They were then asked to rate on a scale from 1 to 100 the amount of regret they would feel for each type of erroneous verdict in such a case.

Two types of erroneous verdicts were possible: (1) the conviction of an innocent person, or the conviction of a guilty person for a degree of homicide more severe than the "true" crime warranted (Ellsworth called this "harsh error"), and (2) the acquittal of a guilty person, or the conviction of a guilty person for a degree of homicide less severe than the "true" crime warranted (denoted "lenient error").[103]

Ellsworth found that the "*Witherspoon*-qualified" subjects expressed equal regret for "harsh" and "lenient" errors, whereas the "guilt phase

---

[103]The table below, which was adapted from the written instructions given to the subjects, shows the possible "harsh" and "lenient" errors.

How to Fill In the Table

The table below contains 16 boxes that correspond to 16 possible occurrences. In each box put a number indicating how much regret you would feel if your jury found the verdict listed to the left of the box but the defendant is later proven to be guilty of the verdict above the box. For example, in box number 7 put a number (0-100) indicating how much regret you would feel if your jury found the defendant guilty of second degree murder but it is later proven the defendant was only guilty of manslaughter.

The defendant is later proven to be:

| | | Guilty of 1st degree murder | Guilty of 2nd degree murder | Guilty of Manslaughter | Not Guilty |
|---|---|---|---|---|---|
| | Guilty of 1st degree murder | 1 | HE 2 (Harsh Error) | HE 3 (Harsh Error) | HE 4 (Harsh Error) |
| Your jury found the defendant: | Guilty of 2nd degree murder | LE 5 (Lenient Error) | 6 | HE 7 (Harsh Error) | HE 8 (Harsh Error) |
| | Guilty of Manslaughter | LE 9 (Lenient Error) | LE 10 (Lenient Error) | 11 | HE 12 (Harsh Error) |
| | Not Guilty | LE 13 (Lenient Error) | LE 14 (Lenient Error) | LE 15 (Lenient Error) | 16 |

includable" subjects felt a considerably higher amount of regret for "harsh" errors than for "lenient" errors. The differences were statistically significant. (P < .05.) This suggests, Ellsworth testified, that the two groups differed in their thresholds of reasonable doubt and hence their propensity to convict. (Cf., *ante*, fn. 101.)

A second study was conducted to determine whether the two groups also differed in their "perception of the credibility of defense and prosecution witnesses."[104] The subjects in this study were 36 persons who had previously participated in the *Ellsworth Conviction-Proneness Study.* Sixteen were "guilt phase includable" and twenty were "*Witherspoon*-qualified."[105]

Ellsworth had prepared a 20-minute videotaped simulation of the conflicting testimony of a white police officer and a black defendant on trial for assaulting the officer. The simulated case involved a physical confrontation between the officer and the defendant during what the officer described as a routine crowd-control incident and the defendant described as police harassment. The experimenters' intention was to create two equally likely versions of the event. The script had been reviewed for realism by a group of lawyers and psychologists, and the videotape had been pretested for plausibility.

The videotape was shown to 36 subject/jurors, who were then asked 16 questions concerning (1) the accuracy and truthfulness of the 2 witnesses; (2) the extent to which specific facts mentioned by each witness seemed to be true; and (3) the appropriateness of each witness' behavior. On each of the 16 questions the "*Witherspoon*-qualified" subject/jurors gave (as a group) answers that were more favorable to the police officer than did the "guilt phase includable" group. The differences were statistically significant, with a "p" value of .05 or less, on 10 of the 16 questions. Summing up the responses to all questions revealed an overall difference of about 20 percent in the groups' assessments of credibility. This disparity was statistically significant at less than a .0002 level.

---

[104]Ellsworth et al., The Effect of Capital Punishment Attitudes on Juror Perceptions of Witness Credibility (1979, prepub. draft) page 1 (hereinafter, the *Ellsworth Witness-Credibility Study*).

[105]Most of the subjects in this study were female (70 percent), fairly well-educated (33 percent had completed four or more years of college), and white (there were no blacks, one Chicano, and one Native American). About 30 percent had previously served on an actual jury. There were more Republicans (47 percent) than Democrats (39 percent) or Independents (14 percent).

Ellsworth testified that this study demonstrated "a way in which the different attitudes that these people come in with do translate into different perceptions. And those perceptions are...very relevant to the actual behavior that jurors would engage in [when] deciding on guilt or innocence, that is, your perception of how credible various witnesses are."

The results of the *Ellsworth Witness-Credibility Study* were replicated to some extent in the *Ellsworth Conviction-Proneness Study*. As previously indicated, after the subject/jurors of the latter study had indicated their personal beliefs as to the accused's guilt or innocence, most of them were divided into 12-person juries and allowed to deliberate. (Cf., *ante*, fn. 78.) Some of the juries were composed entirely of "*Witherspoon*-qualified" jurors and some had a mixture of "*Witherspoon*-qualified" and "guilt phase includable" jurors.[106]

After one hour, the deliberations were terminated and the subjects given a written questionnaire to fill out. Among the items on the questionnaire were six questions asking "How believable was the testimony?" of each of the six witnesses who testified. As shown by the chart below, the "*Witherspoon*-qualified" jurors (the "D.Q." jurors in the chart) believed each of the prosecution witnesses more than the "guilt phase includable" jurors ("Excl.") did. As for the two defense witnesses, their credibility was rated higher by the "guilt phase includable" jurors than by the "*Witherspoon*-qualified" jurors. As Ellsworth testified, these results "can be considered simply a replication across a whole series of witnesses in a different [situation] of what we got in the witness credibility study."

ELLSWORTH CONVICTION—PRONENESS STUDY

Post-Deliberation Perception of Witness Credibility: Two Comparisons Based Upon Mean Responses* to the Questions "How Believable Was The Testimony Of_____?"

1. Comparison of death-qualified jurors who served either on mixed or on death-qualified juries, with excludable jurors

\* For each post-deliberation question concerning witness credibility each juror selected a response on a scale ranging from 1 to 7, where a response of 1 indicated that the juror found a witness "Very believable," and a response of 7 indicated that the juror found a witness "Not at all believable." The bars on this chart represent the mean responses for each designated category of respondent.

[106]No jury had more than four "guilt phase includable" jurors.

## VI

### CRITICISMS OF THE STUDIES RELATING
### TO THE WITHERSPOON AND BALLEW CONTENTIONS

The Attorney General raises several major methodological arguments to attack the conclusions which petitioner would draw from these studies. Most of the criticisms do not have merit. ▮▮ However, there is merit in one of his arguments—what he calls the "crux" of his position. Consequently, petitioner's *Witherspoon* and *Ballew* contentions must be rejected as not established by the record presently before this court.

▮ Several of the criticisms do not require extended discussion. For example, it is contended that none of the studies can be considered reliable indices of how real jurors would act, since the subjects of the studies did not have the same sense of "felt responsibility" as would a juror in an actual criminal trial.

There are several responses to the criticism. First, the criticism is inapplicable to the *Zeisel* study, since he drew his data from jurors who had actually sat and deliberated on real criminal cases. The fact that Zeisel's study is fully consistent with the results of the other, controlled experiments strongly indicates that the absence (if any) of felt responsibility did not produce spurious results. Second, it appears that the subjects in the *Ellsworth Conviction-Proneness Study* did "g[e]t very, very into deliberations." Those subjects in this study who had had prior jury experience reported that the experimental situation corresponded well with their jury service. The defense experts also testified that it was not at all unusual for subjects in controlled jury studies to become involved in their cases to the degree that Ellsworth's subjects did.

Significantly, a comparison among the controlled conviction-proneness studies shows that the differences found in voting behavior tend to get wider as the studies become more realistic and involving. Thus, the studies using written stimuli found differences of 6 and 7 percent (*Goldberg, Harris 1971*). However, this rose to 13 percent when an audiotape was used (*Jurow*) and to 25 percent when a videotape was employed (*Ellsworth Conviction-Proneness*). This trend also indicates that any absence of felt responsibility would not alter the conclusions to be drawn from the studies.

Finally, it must be noted that in reaching its constitutional conclusions in *Ballew* v. *Georgia, supra,* 435 U.S. 223, the United States Supreme Court relied heavily on controlled studies, none of which involved "real" jurors and hence "real" felt responsibility. It would appear that the use of such studies has been already approved.[107]

Similar considerations lead this court to reject the Attorney General's next criticism of the studies, i.e., that they did not involve juror interaction and deliberation. Again, this critique is inapplicable to the *Zeisel* study. Further, the subject/jurors in the *Ellsworth Conviction-Proneness Study* deliberated for an hour, and the significant differences between the "guilt phase includable" jurors and the "*Witherspoon*-qualified" jurors remained even after that time. Moreover, much of the force of this criticism is further overcome by the findings of Kalven and Zeisel, *supra,* and others that in the overwhelming number of cases, the jury will eventually reach a unanimous verdict consistent with the position of the first ballot majority. (Cf., *ante,* fn. 56.) This indicates that the critical factor in jury decision making is not the process of juror interaction but the jurors' original views of the case, which are formed at or near the time the case is submitted to them for decision.[108]

Next, it is asserted that the studies (except the various polls and the *Harris 1971* and *Ellsworth Attitude* surveys) must be disregarded because the subjects involved were not representative of the general population. This contention reveals a fundamental misunderstanding of the conclusions sought to be drawn from these studies, a misunderstanding which was repeatedly addressed by the experts at the hearing below. The studies are being used to show differences in behavior and attitudes between groups; they are not being used to show the relative size of one group to another. Under these circumstances, a researcher need not insure that the groups are included in the study in the same proportions as they appear in the general population. Rather, it must merely be insured that there is a sufficiently large number of persons in

---

[107]The Supreme Court has relied on similar controlled studies in other cases in addition to *Ballew.* See, e.g., *Williams* v. *Florida, supra,* 399 U.S. at pages 101-102 [26 L.Ed.2d at pages 460-461]; *Colgrove* v. *Battin, supra,* 413 U.S. at pages 158-160 [37 L.Ed.2d at pages 529-531]. Indeed, *Witherspoon* itself clearly invited such research.

[108]Zeisel and others appear to have assumed that the first ballot occurs prior to any jury deliberation. That assumption has not been proven. (Cf. CALJIC No. 17.41.) However, Ellsworth's finding that differences between the "guilt phase includables" and "*Witherspoon*-qualified" jurors remain after an hour's deliberation suggests that a juror's first ballot vote is closely tied to his or her predeliberation views of the case.

each group to enable the researcher to draw conclusions about the characteristics of that group.[109]

In any event, the criticism concerning representativeness all but disappears when the studies are viewed as a whole, not in isolation. As Dr. Zeisel noted, the results of these studies are consistent irrespective of whether the subjects are southern college students, northern industrial workers, Illinois or New York jurors, persons eligible for jury service in California, or persons selected randomly from throughout the nation. It defies reason to attribute the studies' results to "unrepresentative" or nonrandom samples.

■ However, there is a more telling criticism of the conclusions which petitioner seeks to draw from the evidence relating to the *Witherspoon* and *Ballew* issues. The pool of jurors eligible to serve in a capital trial in California consists of those persons eligible to serve in a noncapital case whose attitudes toward capital punishment would place them in either the "favor death penalty," "indifferent," or "oppose death penalty" group. (Cf., *ante*, fns. 34, 48.) Thus, in order to establish that a capital case jury in this state is drawn from a pool that is less than neutral with respect to guilt or is inadequate to effectuate the purposes and functions of a jury, petitioner must establish deficiencies in a pool consisting of those *three* groups, i.e., the "California death-qualified" groups.

None of petitioner's studies expressly focused on a pool comprised in this manner. They do focus on the deficiencies in a pool of "*Witherspoon*-qualified" jurors. However, at least in theory, a pool of "*Witherspoon*-qualified" jurors differs from a pool of "California death-qualified" jurors. The former contains a fourth group in addition to the three "California death-qualified" groups, i.e., a "*Witherspoon*-qualified" jury pool also contains the "automatic death penalty" group.[110] Thus, in order to draw conclusions about a pool of "California

---

[109]A simple example illustrates the point. If a researcher wants to determine whether grapefruits are larger (or heavier or yellower or tarter or have any other characteristic in greater proportions) than lemons, he need only gather a reasonable number of each fruit, measure them, and compare the results for grapefruits with those for lemons. From this comparison, he can confidently say that grapefruits in general are larger (heavier, less yellow, etc.) than lemons. However, he *cannot* say that grapefruits are more *numerous* than lemons. Only if he wanted to test this latter hypothesis would he have to design a technique to obtain each fruit in proportion to its population in the real world.

[110]The *Witherspoon* decision did not directly address whether the Constitution requires the exclusion of those who would automatically vote for the death penalty in

death-qualified" jurors on the basis of the evidence introduced below, petitioner must be able to account for the "automatic death penalty" jurors. It is asserted by the Attorney General that petitioner is unable to do this in a scientifically adequate fashion. In short, petitioner is said to have proved the wrong proposition.

Petitioner seeks to overcome the critique in several ways. First, he contends that the "automatic death penalty" group is a tiny group compared to the "*Witherspoon*-qualified" group as a whole. If this were true, it is urged, then the results of petitioner's studies would not be appreciably altered by subtracting the few "automatic death penalty" jurors from the large class of "*Witherspoon*-qualified" jurors.

However, there is no reliable evidence in the record to support petitioner's assumption as to the minute size of the "automatic death penalty" group. The defense experts below repeatedly admitted that "nobody knows" the size of this group. There are tentative indications in the record that this group may be as small as 1 percent (or less) of the adult population or as large as 28 percent.[111]

Petitioner notes that there is no reliable data indicating that this group does appear "in substantial numbers" in California jury pools, but this observation does not advance his cause. *Witherspoon* placed the burden on the *accused* to establish the nonneutrality of a death-qualified jury. (Cf., *ante*, fns. 37 and 38 and accompanying text.) Until petitioner makes out at least a prima facie case of unconstitutionality,

---

every case. (But see the discussion of dictum in *Witherspoon* at *ante*, fn. 49.) It was generally an implicit assumption common to all of petitioner's post-*Witherspoon* studies that the "automatic death penalty" group was "*Witherspoon*-qualified." It is unnecessary to pursue the issue further, since the exclusion of this group is required by statute in this state. (*People* v. *Hughes, supra,* 57 Cal.2d at pp. 94-95; *People* v. *Gilbert, supra,* 63 Cal.2d at p. 712.)

[111]Jurow found that about 2 percent of his 211 subjects fell into the "automatic death penalty" category. As will be seen, Ellsworth believed that none of the "strongly favored" subjects in her conviction-proneness study was in this class. It was readily admitted by the defense witnesses below that these findings did not afford a reliable basis for generalizing to the percentage of such jurors in the entire population, since neither of these studies was based on a random sample of the population.

Although not based on hard data, the opinion of experts who testified on the issue was that the percentage of "automatic death penalty" jurors in the population was very low. However, one of the studies admitted at the hearing but rarely mentioned suggests the percentage may be considerably higher. (Smith, *A Trend Analysis of Attitudes Toward Capital Punishment, 1936-1974* (1975) pp. 4-5, in Studies of Social Change since 1948 (Davis edit. 1976) report 127B.)

the state is not required under *Witherspoon* to make any factual showing. The lack of reliable evidence on the effect of California's exclusion of "automatic death penalty" jurors from capital cases means petitioner has not made any reliable showing that a pool of "California death-qualified" jurors differs from the pool of jurors who are eligible to serve at noncapital trials.[112]

Following oral argument in the present proceeding, the United States Supreme Court decided *Adams* v. *Texas* (1980) 448 U.S. 38 [65 L.Ed. 2d 581, 100 S.Ct. 2521]. There, the court struck down a Texas statute which disqualified a prospective juror from serving in a capital case "unless he states under oath that the mandatory penalty of death or imprisonment for life will not affect his deliberations on any issue of fact." (Tex. Pen. Code Ann., § 12.31(b) (Supp. 1980), quoted at 448 U.S. at p. 42 [65 L.Ed.2d at p. 587].) The Supreme Court reasoned that the statute violated the principles of *Witherspoon*, since it authorized the exclusion of jurors on "broader grounds based on their opinions concerning the death penalty" than is permitted by *Witherspoon. (Id.,* at p. 49 [65 L.Ed.2d at p. 592].)

In the course of seeking to uphold Adams' death sentence, the State of Texas argued the statute was "neutral" in that it permitted the disqualification of persons favoring the death penalty on the same basis as persons opposed. (*Id.,* at p. 49 [65 L.Ed.2d at p. 592].) The high court

---

[112]The issue has been muddled considerably by the parties' dispute over a seemingly related but ultimately irrelevant side issue. In order to suggest that "automatic death penalty" jurors exist in significant numbers, the Attorney General has lodged the reporter's transcript of the voir dire in the Moore brothers' trial. The transcript purportedly shows that in that case—which involved more than 100 felony charges against 2 defendants—12 of 86 prospective venirepersons were excused for cause because they indicated they would automatically vote for the death penalty.

However, as petitioner correctly observes, some if not all of the 12 excused venirepersons seemed to express the belief that if they found the defendants *in that case* guilty of all of the multifarious charges alleged, they would vote to impose the death penalty, regardless of any evidence presented in mitigation at the penalty phase. While such a fixed opinion does authorize removal of a juror for cause (§ 1073, subd. Second), it does not indicate that the juror would vote to impose the death penalty *in every case* where it is legally available (i.e., it does not per se translate into membership in the "automatic death penalty" class).

The number of venirepersons who hold views akin to those of the jurors in the Moore brothers' trial will obviously fluctuate greatly from trial to trial, depending upon the nature of the charges. Their relative number in the jury pool of one exceptional trial does not aid in fixing the size of the more constant "automatic death penalty" class in the population as a whole. Nor does it aid petitioner, since the existence of these "case-by-case excludables" does not establish that the "automatic death penalty" group is small.

responded by stating that this feature of the statute created only an "appearance of neutrality." (*Ibid.*) The court noted the "hypothetical existence of the juror who believes literally in the Biblical admonition 'an eye for an eye,'" but, it stated, "it is undeniable, and the State does not seriously dispute, that such jurors will be few indeed as compared with those excluded because of scruples against capital punishment." (*Ibid.* [65 L.Ed.2d at p. 592].)

These comments by the United States Supreme Court do not persuade this court to alter its conclusions with respect to petitioner's failure to account for the "automatic death penalty" group in his challenge to the neutrality of a "California death-qualified" jury. Even if this court were to accept the Supreme Court's suggestion as to the relative sizes of the two groups in question, petitioner's problem would not be solved. In order to extrapolate from petitioner's showing about a "*Witherspoon*-qualified" jury to his intended conclusion as to a "California death-qualified" jury, it is necessary to know more than just the relative *size* of the "automatic death penalty" group. The impact of this group on petitioner's statistical calculations would depend on both its size and its voting behavior in the jury room. (Cf., *post*, fn. 115 and accompanying text.) A small group would have an impact beyond its sheer numbers if it tended to be more unified in its voting behavior (or other relevant characteristic) than a larger but less cohesive group. Petitioner's evidence contains no indication of the relevant characteristics of the "automatic death penalty" group as compared to the other groups.[113]

Next, petitioner contends that the *Ellsworth Conviction-Proneness Study* enables him to draw conclusions about the appropriate "California death-qualified" groups. At the time this study was conducted, none of the subject/jurors was asked a question which would have identified

[113]It is curious that the United States Supreme Court chose to respond to Texas' argument about the evenhandedness of the Texas statute by speculating as to the relative sizes of the groups excluded. Texas' contention was unmeritorious on its face, regardless of the relative sizes of those groups.

*Witherspoon* established that a constitutionally neutral jury is one drawn from a pool which includes (in appropriate proportion) *all* segments of the community of fair and impartial adults. (Cf., *ante*, at pp. 19-21.) A jury from which a segment of that community has been excluded (or is underrepresented) does not become constitutionally neutral merely because an opposing segment is also excluded. The concept of constitutional neutrality contemplates jury *diversity*, and the reasons for jury diversity include more than simply counterbalancing opposing viewpoints. (Cf., *ante*, at pp. 23-25.) Thus, there appears to have been no reason for the *Adams* court to resort to speculation as to the relative sizes of the "eye for an eye" and "scrupled" groups. Texas' argument was unsound on a more fundamental level.

him or her as an "automatic death penalty" juror. However, when it appeared from the testimony of earlier witnesses at the hearing on the Moore brothers' motion that this may have been an "imperfection" in her study, Ellsworth recontacted by telephone those subjects who had previously indicated they "strongly favored" the death penalty.[114] Of the 23 subject/jurors in the "strongly favor" category, she was able to contact 22. All 22 indicated they "would be willing to consider voting for life imprisonment or death depending on the evidence...in the case."

While the *Ellsworth Conviction-Proneness Study* was in other respects an outstanding piece of research, the propriety of relying on such a delayed call-back procedure as a reliable means of retroactively identifying the attitudes of one's subjects is doubtful. Ellsworth herself indicated it was "conceivable" (albeit "doubt[ful]") that different answers would have been obtained had the "automatic death penalty" question been asked several months earlier along with the other questions about capital punishment attitudes.

Petitioner's assertion that the *Ellsworth Conviction-Proneness Study* demonstrates the nonneutrality of a "California death-qualified" jury presents another problem as well. Even if this study reliably showed that "California death-qualified" jurors tend to be more conviction-prone than "guilt phase includable" jurors, it does not necessarily follow that the former would also tend to be more conviction-prone than are jurors in a noncapital case.[115] It is this latter showing which is the crux of the *Witherspoon* issue. However, the study's omission of the "automatic death penalty" group—which comprises an unknown proportion of the pool of jurors in noncapital cases—renders unsound petitioner's leap from the results of this study (that "California death-qualified" jurors are more conviction-prone than "guilt phase includable" jurors) to the conclusion that "California death-qualified" jurors are also more conviction-prone than a "neutral" jury.[116]

---

[114]This occurred approximately three to four months after the subjects had participated in the videotape study. The subjects who had indicated they simply "favored" the death penalty were not recontacted, since they had already answered a question indicating they would vote for life imprisonment in at least some cases.

[115]The jury pool in a noncapital case consists not only of "California death-qualified" and "guilt phase includable" jurors but also of "automatic death penalty" jurors. (Cf., *ante*, fn. 54.)

[116]A simplified example may make this point clearer. Assume that the voting population of a hypothetical community consists entirely of Republicans, Independents, and Democrats and that a potential candidate in that community wishes to determine

In view of these gaps in the *Ellsworth Conviction-Proneness Study*, this court cannot ground a constitutional decision on its results alone.

Finally, petitioner urges, in response to the Attorney General's contention, that he (petitioner) "is entitled to the representation [in] his jury [pool] of all viewpoints and outlooks that are represented in the population; he is entitled to any fair-minded juror who may properly be randomly selected to serve." The first half of the statement is correct, but his evidence has not established that any "viewpoints or outlooks" have been excluded from the jury pool. All he has shown is that if a state used all four "*Witherspoon*-qualified" groups in a capital trial, the jury would not be neutral. California is not such a state.

The second half of petitioner's statement may be a correct statement of law under a cross-sectional analysis, but petitioner has repeatedly declined to invoke such an analysis. However, petitioner's assertion is incomplete under the *Witherspoon* analysis. The exclusion of "fair-minded" jurors is improper under *Witherspoon* only if it can be established that such exclusions tend to result in a nonneutral jury, i.e., in the elimination or underrepresentation of those fair and impartial jurors who would tend to draw conclusions favorable to the accused about issues in the trial, and in the overrepresentation of such jurors favorable to the prosecution. Petitioner has failed to make such a showing as to "death-qualified" juries in California.

Therefore, until further research is done which makes it possible to draw reliable conclusions about the nonneutrality of "California death-qualified" juries in California, this court does not have a sufficient evidentiary basis on which to bottom a constitutional holding under *Witherspoon* and *Ballew*. It is, indeed, unfortunate that so much research, time, and energy has been expended in this area with the result

---

whether Independents would tend to vote for him less often than the voting population as a whole.

If the candidate compared the voting tendencies of Independents merely with those of Democrats and discovered that Democrats would vote in his favor more often, he would not have a reliable answer to his question. This is true because he would not know whether the voting tendencies of Republicans in the population as a whole would operate to wipe out the difference discovered when Independents are compared to Democrats alone.

that no one stopped to consider the differences between a *"Witherspoon-qualified"* jury and a "California death-qualified" jury.

The trial court properly rejected petitioner's motion under *Witherspoon* and *Ballew* to limit the exclusion for cause of jurors unalterably opposed to capital punishment.

## VII

### THE USE OF SEQUESTRATION IN DEATH-QUALIFYING A JURY

 Petitioner asks this court to consider whether the procedures currently used in this state to identify death-qualified jurors alter the jury to the detriment of an accused. The specific question is whether the voir dire process in death-qualifying a jury inclines jurors to become more favorable to the prosecution than if a more refined technique were used. At the hearing below, petitioner presented testimony which indicated that current procedures create in the minds of the jurors certain expectations unfavorable to the accused and predispose the jurors to receive and interpret evidence in ways favorable to the prosecution.[117] Various refinements in the current procedure are suggested in order to minimize, if not eliminate, the most prejudicial of these effects.

Presently, the defense counsel[118] and the prosecutor[119] have the right to question potential jurors about their attitudes toward the death penalty in order to lay a foundation for possible challenges for cause. The voir dire is usually conducted in open court with the entire jury panel present. Although each juror is questioned personally, he or she has the opportunity to observe the examination of many other venirepersons.[120]

---

[117]If petitioner's claims are correct, then the present death-qualification procedures are likely to render a jury "less than neutral" in the way it addresses the issues of guilt and punishment by diminishing the diversity of viewpoints and attitudes represented on the jury. In turn, this reduction of diversity will make the jury less accurate in its fact-finding and less reliable in its application of community standards.

[118]*People v. Hughes, supra*, 57 Cal.2d at pages 95-96.

[119]*People v. Wein* (1958) 50 Cal.2d 383, 394 [326 P.2d 457].

[120]There is authority permitting an *in camera* voir dire of individual jurors in an appropriate case. (*People v. Rutkowsky* (1975) 53 Cal.App.3d 1069, 1073-1074 [126 Cal.Rptr. 104].)

A typical death-qualifying voir dire includes repeated explanations of the procedural route the jury will travel if it is to reach the penalty phase. Potential jurors are examined in detail about their attitudes toward capital punishment. Frequently, this questioning is couched in hypothetical terms. Potential jurors are asked to assume that the accused has been found guilty of first degree murder and to imagine that the special circumstances allegations have been found true. They are then asked to indicate whether they could fulfill their legal responsibility to choose the appropriate penalty based on the evidence presented. The court has the task of ruling on whatever challenges for cause may be lodged against them.

There are several reasons why these methods for death-qualifying a jury might be expected to have an impact on the expectations, perceptions, attitudes, and behavior at trial of the jurors exposed to them. These affect both the guilt and penalty determinations.

The process presently used focuses attention on penalty before the accused has been found guilty. As a result, some jurors may be more likely to believe the accused is guilty as charged. Modern psychological theory suggests several reasons to anticipate such a result.

Few human impulses are more fundamental than the need to make sense of one's surroundings. People who find themselves in novel, complicated, or confusing situations instinctively seek guidance in interpreting those situations. Accordingly, they become sensitive to the way other people around them seem to be behaving. When authority figures who appear to be familiar with the situation are present, they take on added importance and influence. In such a fashion, venirepersons who are in the unfamiliar and imposing surroundings of a courtroom, undergoing the oftentimes elaborate and sometimes baffling ritual of voir dire, will typically seek cues about appropriate ways of thinking, feeling, and believing. Such venirepersons are likely to look to the behavior of the most knowledgeable and respected figures in the courtroom, i.e., the judge and counsel.

In a typical death-qualifying voir dire, the judge and the attorneys repeatedly instruct the jurors about the steps leading to the penalty trial and question each prospective juror, oftentimes at considerable length, concerning his or her attitudes about capital punishment. These repeated displays of concern about the death penalty before any evidence of

guilt has been presented may prompt the jurors to infer that the court and counsel assume the penalty trial will occur.

A penalty trial is contingent on a guilty verdict and a finding of special circumstances. Jurors undergoing death-qualification would have reason to infer that the judge and the attorneys personally believe the accused to be guilty or expect the jury to come to that conclusion. Only such an inference could serve to explain to the jurors why so much time and energy are devoted to an extensive discussion of penalty before trial. Provided with these cues from people who are not only experts in the courtroom but are also presumably acquainted with all the evidence in the case, the relevant law, and the "correct" application of the one to the other, death-qualified jurors may themselves become more inclined to believe that the accused is guilty as charged.

The effects of such a predisposition on the jury's eventual verdict would be expected to be magnified by the particular ways in which a jury functions. Diversity of experience and viewpoint enables a jury to compensate for the perceptual and evaluative limitations inherent in any one particular point of view. (Cf., *ante*, at pp. 23-25.) However, current methods used in voir dire may impede these corrective mechanisms by the operation of what is known as "perceptual set." The concept of perceptual set, explained one expert witness at the evidentiary hearing below, "suggests that when people begin to form a framework for understanding, particularly with respect to complicated events with which they are somewhat unfamiliar, they begin early on in the process to form a perspective, to form a way of interpreting that information. . . . Perceptual set affects not only what they do with information, but indeed it also affects what they view as information. There is a notion of selective attention, the idea that people only attend to certain kinds of things. When they are presented with complicated information they tend to select out of that information for the most part information which conforms with their belief structure, which conforms with their attitudes, which conforms with their expectations. That is what they look for, that is what they see, and they interpret it differently based on attitudes, beliefs, and expectations."

If a juror is predisposed by the very process of the death-qualifying voir dire to believe the accused is guilty,[121] the juror will tend, in conse-

---

[121]Studies in an area of social psychology called attribution research have identified another mechanism which suggests why the death-qualification process might influence

quence of that perspective: (1) to selectively perceive the evidence—e.g., "forgetting," distorting, or actually failing to perceive evidence which conflicts with his or her preconceptions; (2) to draw only those inferences from the evidence which support those preconceptions and perhaps to "create" data to reinforce those beliefs; and (3) to evaluate the evidence perceived—e.g., assess credibility of witnesses, weigh the inferences drawn—in a manner which tends to fulfill his or her expectations. (See *ante*, at pp. 23-24.) Moreover, a juror who is predisposed to expect a guilty verdict will tend to arrive more readily at the conclusion that the evidence presented amounts to proof beyond a reasonable doubt.

These tendencies would not be nullified by the evidence actually presented in the courtroom because what the jurors perceive to be evidence will itself be a function of the attitudes, beliefs, and expectations with which they view the proceedings. Of course, the jurors' "perceptual sets" are unlikely to determine the outcome in those cases in which the evidence points overwhelmingly in one direction or another. But the influence of the jurors' "perceptual set" increases—along with the dangers of miscarried justice—as the evidence becomes more closely balanced between guilt and innocence. It becomes especially important to scrupulously safeguard the accused's constitutional rights to a fair trial in such cases, because what might in a more clear-cut case have only an insignificant effect on the way the jurors view the evidence could "provide[] the slight impetus which [swings] the scales toward guilt." (*Glasser* v. *United States* (1942) 315 U.S. 60, 67 [86 L.Ed. 680, 698, 62 S.Ct. 457].) "[I]t is with respect to those cases that the jury trial right has its greatest value. When the case is close, and the guilt or innocence of the defendant is not readily apparent, a properly functioning jury system will insure evaluation by the sense of the community and will also tend to insure accurate factfinding." (*Ballew* v. *Georgia, supra,* 435 U.S. at pp. 237-238 [55 L.Ed.2d at p. 245].)

A capital jury, which has been predisposed by virtue of the very process by which it has been selected to think the accused guilty in advance of trial, is unlikely to function properly or maintain its neutrality. As a

a jury's determination of guilt or innocence. This research has demonstrated that imagining the occurrence of a possible event increases a person's belief that the event will come to pass. An imagining process also occurs in the death-qualifying voir dire. People are asked to consider what they would do if the trial were to proceed to the penalty phase. These venirepersons would accordingly be more likely to expect that the penalty phase will occur. Since the occurrence of the penalty phase is contingent on conviction and the finding of special circumstances, these venirepersons might also expect these intermediate steps to occur.

jury's neutrality decreases, the quantum of evidence necessary to prove guilt also decreases.

In addition to making a capital jury prone to convict, the current method of death-qualification may alter the states of mind of the jurors exposed to it in ways which make them more likely to impose a death sentence. It is important to recognize that in the penalty phase, no less than in the guilt phase, the jury serves as a representative of community values. "[O]ne of the most important functions any jury can perform in making . . . a selection [between life and death] is to maintain a link between contemporary community values and the penal system—a link without which the determination of punishment could hardly reflect 'the evolving standards of decency that mark the progress of a maturing society.'" (*Witherspoon* v. *Illinois, supra,* 391 U.S. at p. 519, fn. 15 [20 L.Ed.2d at p. 783], citation omitted.) A jury in a penalty trial is thus called upon to "express the conscience of the community on the ultimate question of life or death."[122] (*Id.,* at p. 519 [20 L.Ed.2d at p. 783], fn. omitted.)

A penalty jury can speak for the community only insofar as the pool of jurors from which it is drawn represents the full range of relevant community attitudes. In *Witherspoon,* the Supreme Court held that those who hold scruples against capital punishment must be included within this pool so long as they are willing to *consider* the choice of penalty provided by law and are not irrevocably committed to vote

---

[122]At the time *Witherspoon* was decided, the State of Illinois made the death penalty "'an optional form of punishment which [the jury remains] free to select or reject as it [sees] fit.'" (*Id.,* at p. 519, fn. 15 [20 L.Ed.2d at p. 783], citation omitted, brackets in original.) Such unguided and unchecked discretion was subsequently held unconstitutional in *Furman* v. *Georgia* (1972) 408 U.S. 238 [33 L.Ed.2d 346, 92 S.Ct. 2726]: "*Furman* mandates that where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." (*Gregg* v. *Georgia* (1976) 428 U.S. 153, 189 [49 L.Ed.2d 859, 883, 96 S.Ct. 2909], plurality opn.)

In the wake of *Furman* and *Gregg,* new statutory provisions dealing with the death penalty have been enacted. The constitutionality of these enactments is not at issue in the present proceeding. Whether or not the statutory scheme is constitutionally sufficient, it cannot be gainsaid that a capital jury in this state exercises considerable discretion in identifying and weighing the circumstances in aggravation and mitigation which it is directed by statute to consider. Even under the guidance of these statutory standards, "a juror's general views about capital punishment [will] play an inevitable role . . ." and in the interaction of diverse views of individual jurors, the jury will still be called upon to "express the conscience of the community on the ultimate question of life or death." (*Witherspoon* v. *Illinois, supra,* 391 U.S. at p. 519 [20 L.Ed.2d at p. 783], fn. omitted.)

against the imposition of the death penalty regardless of the evidence. (*Id.*, at p. 522, fn. 21 [20 L.Ed.2d at p. 785].) The court acknowledged that the caution, reluctance, and even aversion with which many members of the community would pronounce a sentence of death were appropriately represented on a jury which purported to express the conscience of the community: a jury "[c]ulled of all who harbor doubts about the wisdom of capital punishment—of all who would be reluctant to pronounce the extreme penalty," the high court found, "cannot speak for the community." (*Id.*, at p. 520 [20 L.Ed.2d at pp. 783-784].)

Thus, a process which systematically reduces whatever "doubts about the wisdom of capital punishment" or "reluctan[ce] to pronounce the extreme penalty" is as constitutionally infirm as a jury from which individuals who hold such views are systematically "culled." Neither jury can "speak for the community." (*Ibid.*) Both juries are "less than neutral" with respect to the choice of penalty. (*Id.*, at p. 520, fn. 18 [20 L.Ed.2d at p. 784].)

Several theories discussed at the evidentiary hearing below explain why the current modes of death-qualification might increase jurors' willingness to impose a sentence of death. During a death-qualifying voir dire, venirepersons are questioned in open court about their attitudes toward the death penalty. The fact that the court dismisses those venirepersons who express unequivocable opposition to the death penalty is likely to be interpreted by the remaining jurors as an indication that the judge in particular and the law in general disapprove of such attitudes. Jurors whose scruples against capital punishment are not so irrevocable as to disqualify them under *Witherspoon* may feel that in the eyes of the law, their attitudes are improper, or at least suspect. Those jurors may in consequence feel less willing to express or rely on such attitudes in their consideration of penalty.[123]

Another relevant concern is drawn from research into the process of desensitization. For many people, even those who are in favor of the death penalty, the prospect of having to make a personal decision about whether another human is to live or die poses an understandably intimidating duty. While the state has a legitimate interest in a death penalty jury which is willing to consider the imposition of capital punishment in

---

[123]It should be noted that insofar as the venirepersons observe the judge dismissing prospective jurors who would automatically vote *for* the death penalty, the remaining jurors might infer a more symmetrical disapproval on the part of the law, offsetting the prejudicial operation of this particular psychological process.

an appropriate case (*Witherspoon* v. *Illinois, supra,* 391 U.S. at p. 522, fn. 21 [20 L.Ed.2d at p. 785]), the instinctive caution and reluctance with which many jurors approach this duty are representative aspects of the community conscience which the jury is called upon to express.

When people are continually exposed to a stimulus which is intimidating or frightening to them, they become desensitized to what they earlier found to be threatening.[124] In a capital voir dire, prospective jurors are repeatedly prompted to think about the penalty decision they may later be called upon to make. What was initially regarded as an onerous choice, inspiring caution and hesitation, may be more readily undertaken simply because of the repeated exposure to the idea of taking a life. Some jurors initially face the penalty decision with reluctance and aversion. This may represent a significant viewpoint in the community. A process which systematically erodes these attitudes would make the jury less representative of the community and more inclined to impose death.

In 1979, Dr. Craig Haney, an assistant professor of psychology at the University of California at Santa Cruz, devised a controlled study to determine whether the process of death-qualification actually alters jurors' states of mind so that it affects their evaluation of guilt or their choice of penalty.[125] The subjects of the experiment were selected from adults eligible for jury duty in Santa Cruz County who had responded to a local newspaper advertisement. The researchers screened the respondents by telephone, and eliminated from the study those whose attitudes about capital punishment disqualified them under the *Witherspoon* criteria.

Haney had prepared a two-hour videotape of a simulated voir dire in a capital trial. The voir dire was not scripted; the attorneys depicted on the tape based their questioning on the facts of an actual capital case. The roles of judge, prosecutor, and defense counsel were played by experienced private defense attorneys. The roles of most of the venirepersons were played by adult residents of Alameda County whose responses to an earlier survey had indicated that they would be qualified

---

[124]For example, people suffering from acrophobia may be desensitized toward their fear by repeatedly being taken on elevator rides to high places.

[125]Haney, The Biasing Effects of the Death Qualification Process (1979 prepub. draft).

to serve under the *Witherspoon* guidelines. Two of the venirepersons who were questioned on the videotape were confederates placed by Haney. These two were instructed to respond to the voir dire questions concerning capital punishment as if they had views which would render them ineligible under *Witherspoon*.[126]

The 67 subjects of Haney's study were randomly divided into two groups for purposes of viewing the videotaped voir dire. Both groups were asked to imagine themselves to be "prospective jurors in this very case." One group—the "experimental" group—was shown the full two-hour videotape which included half an hour of death-qualification.[127] The "control" group saw the same videotape with the death-qualifying segment deleted. Each version of the videotape contained various introductory remarks and questions from the judge, including a nullification question patterned on Penal Code section 1074, subdivision 8.[128]

After viewing the videotapes, both groups completed a questionnaire. Their responses were consistent with the predictions that the present procedures for death-qualifying a jury alter the jurors' perspectives.

Haney found that the "death-qualified" subject/jurors in his experimental group were more likely than those in the control group to believe the accused was guilty of first degree murder, a finding that was statistically significant.[129] Moreover, the experimental group was more likely to think that the prosecutor and the defense attorney personally believed the accused guilty as charged. The subject/jurors in the experimental group were also more inclined to think that the judge believed the accused to be guilty as charged.

Haney testified that these findings were consistent with the prediction that "the fairly extensive concern with the penalty phase on the

[126]The researchers had not anticipated the behavior of a third venireperson who volunteered during the death-qualifying portion of the voir dire that he had difficulties with the death penalty but who finally said that he could consider imposing it.

[127]The videotape shown to the experimental group was intended to approximate a typical voir dire as it would presently be conducted in a capital case.

[128]The question was: "Is anyone so strongly opposed to the death penalty that in a case in which the defendant might be sentenced to death if the jury found him guilty you could not be a fair and impartial juror and could not obey your sworn duty to decide the defendant's guilt or innocence according to the law and the evidence?"

[129]Except as otherwise indicated, all of the differences between the responses of the control group and the experimental group which are noted in this opinion were statistically significant.

part of the attorneys as well as the judge may well indicate to persons in a somewhat unfamiliar situation, prospective jurors, that...those participants in this process of death-qualification believe this person is guilty or believe that it is reasonably likely that the jury will find him guilty, such that the amount of time which is expended discussing penalty is justified."

The subject/jurors were also asked to assess the likelihood that the accused would later be found guilty of first degree murder and sentenced to death. The experimental group was more likely to predict that the accused would be convicted and sentenced to death. In their responses to another question, those in the experimental group also revealed that they were more likely to expect that the accused would be convicted of some lesser included offense if not of first degree murder.

These results lend support to the hypothesis that "people who are asked to imagine the occurrence of the penalty phase of the trial should be more likely to expect that that penalty phase will take place....[S]o one would...predict that people who have been asked to imagine the occurrence of this penalty phase would predict that it was more likely that the defendant will be convicted and more likely that special circumstances will be found in this particular case."[130]

The two groups were asked to select what they thought would be an appropriate penalty, assuming that the accused had been convicted and a special circumstance allegation of a prior conviction of first degree murder had been found true. Fifty-seven percent of the experimental group indicated that they would vote to impose the death penalty, compared to only 21.9 percent of the control group.[131]

The subject/jurors were also asked whether they thought "the law generally disapproves of people who are opposed to the death penalty." The subject/jurors in the experimental group were substantially more likely than those in the control group to believe that attitudes in opposi-

[130]A selection process which makes jurors more inclined at the outset to believe the accused guilty and to expect his conviction, would also be expected to increase the likelihood that the jurors will in fact find him guilty. The creation at the voir dire proceedings of such a perceptual set will, in Haney's words, "significantly influence the way in which people receive, interpret and make decisions upon information that they receive subsequent to the formation of those attitudes, opinions, beliefs and expectations."

[131]This effect may be attributable to the desensitization which was predicted to take place during the process of death-qualification. (Cf., *ante*, at pp. 74-75.)

tion to the death penalty are legally disapproved. Haney explained this result as follows: "What happens in the process of death-qualification is not only that those persons who were found to be acceptable from the point of view of *Witherspoon* are seated on the jury, but also of course people who are...not able to consider the imposition of the death penalty...are excluded from sitting on the jury....It happens in the presence of other jurors. In fact it is quite likely, I think, to be interpreted by people who witness this event as a sign of disapproval, perhaps, on the part of the court, the judge who makes such a dismissal, perhaps more generally on the part of the law, the notion being that for the legal reason the law disapproves of people who have attitudes in opposition to the death penalty."

The responses to another question lend support to the surmise that the present procedures for death-qualification are likely to increase the juror's beliefs that the judge personally favors the death penalty. The subject/jurors were asked how they thought the judge "personally feels about the death penalty." Those in the experimental group rated the judge's support for the death penalty considerably higher than did those in the control group.[132]

Haney testified that the altered perceptions of the judge's attitude by the subject/jurors in the experimental group may have resulted from "the judgments which the judge was asked to make when forced to decide whether or not someone should be [excused] for cause." These modified perceptions of the attitudes of the most highly respected figure in the courtroom would, he suggested, "lead [jurors who undergo the current procedures for death-qualification] to reconsider [their] attitude[s] and it may well lead [them] to favor the death penalty somewhat more than [they] had...."[133]

Asked to describe the overall conclusion he drew from his study, Haney testified that "people who have been through the process of death-qualification are in a different state of mind when compared to people who have not been through that process. They are in a different

---

[132]There was a *lesser* difference between the two groups' assessments of the prosecutor's support for capital punishment. Both groups believed defense counsel opposed the death penalty, and the small difference in their assessments was not statistically significant.

[133]As noted earlier (*ante*, fn. 123), the exclusion for cause of persons in the "automatic death penalty" category may tend to counteract these tendencies, by suggesting that the law and the judge also disapprove of certain attitudes in favor of the death penalty.

state of mind with relation to the ease with which they select the death penalty as an appropriate penalty or punishment. They are in a different state of mind with respect to the degree to which they believe the prosecutor, defense attorney and judge believe in the death penalty. They are in a different state of mind with respect to the degree to which they believe the prosecutor, defense attorney and judge believe in the guilt of the defendant. And they are also in a different state of mind with respect to the extent to which they expect the defendant would be convicted. And also different in respect to the extent to which they believe the defendant to be guilty.

"My conclusion is that they are in a very different state of mind, and that in each and every case they are in a state of mind which is prejudicial to the defendant in the case."

Haney's findings indicate that the current process for selecting capital jurors creates certain side effects which shape the jury's attitudes toward a death sentence. The courts are appropriately concerned if procedures encourage "[t]endencies, no matter how slight, toward the selection of jurors by any method other than a process which will insure a trial by a representative group." (*Glasser* v. *United States, supra,* 315 U.S. at p. 86 [86 L.Ed. at p. 707].) It has always been the judiciary's duty to counteract processes which generate in jurors "a bias in favor of the prosecution." (*Ibid.*) The high court has been vigilant in its review of procedures which "undermin[e]" and "weaken[ ] the institution of jury trial." (*Ibid.*) These "undermining processes...should be sturdily resisted .... Steps innocently taken may, one by one, lead to the irretrievable impairment of substantial liberties." (*Ibid.*)

Haney's study has served to alert this court to some of the pernicious consequences of our current voir dire procedures in capital cases. This court must be concerned about the threat these procedures present to an accused's constitutionally protected interests in a fair trial.

Haney testified that the prejudicial alteration in attitudes which resulted from a juror's observations of the death-qualification of his or her fellow venirepersons is "a function of exactly how extensive the questioning becomes. The more extensive the questioning, the more you would expect to find important differences between the state of mind of jurors who have been through the one process as compared with those who have been through the other." This proposition implies a corollary:

"the extent to which [these effects] are minimal will be a function of the extent to which the questioning is minimized."

The most practical and effective procedure available to minimize the untoward effects of death-qualification is individualized sequestered voir dire. Because jurors would then witness only a single death-qualifying voir dire—their own—each individual juror would be exposed to considerably less discussion and questioning about the various aspects of the penalty phase before hearing any evidence of guilt. Such a reduction in the pretrial emphasis on penalty should minimize the tendency of a death-qualified jury to presume guilt and expect conviction.[134]

While disputing petitioner's *Witherspoon* and *Ballew* contentions, the Attorney General indicated in oral argument that he had "no objection" to this court adopting a rule of sequestered voir dire in capital cases as a judicially declared rule of criminal procedure. He agreed with expert testimony that "We could get rid of a lot of [the concerns raised by the Haney study] by sequestered voir dire." He also reminded this court that "there's precedent for it in this state during the trial of Ruchell Magee and during the trial of Edmund Kemper in Santa Cruz County where the issue was venue .... So I can't see how I could have any objection to it."

In order to minimize the potentially prejudicial effects identified by the Haney study, this court declares, pursuant to its supervisory authority over California criminal procedure,[135] that in future capital cases that portion of the voir dire of each prospective juror which deals with issues which involve death-qualifying the jury should be done individually and in sequestration.[136] This rule will not in any way affect the

---

[134]Sequestered voir dire may even lead to other benefits. Since they will be questioned outside the presence of the other members of the panel, jurors will be insulated from the influences which the voir dire of their fellow venirepersons may exert. Jurors may also be more forthright and revealing in their responses.

[135]See, e.g., *In re Podesto* (1976) 15 Cal.3d 921, 938 [127 Cal.Rptr. 97, 544 P.2d 1297]; *People v. Cahan* (1955) 44 Cal.2d 434, 442 [282 P.2d 905, 50 A.L.R.2d 513]. See also *Reynolds v. Superior Court* (1974) 12 Cal.3d 834, 845-846 [117 Cal.Rptr. 437, 528 P.2d 45].

[136]This court does not here prescribe any particular form in which to frame questions trial counsel or the court may ask about attitudes toward the death penalty. However, they are cautioned to avoid any questions which may suggest that a particular attitude toward the death penalty is "disfavored." Also, when questions are posed concerning opposition to capital punishment, trial counsel and the court would be well-advised to strive for brevity and to phrase the questions "in the terms *Witherspoon* so unmistak-

open nature of a trial. Although trial counsel or the court may pose general questions to the panel, the venirepersons should not respond to any questions beyond those routinely asked in any criminal trial until they are outside the presence of their fellow venirepersons.[137]

Of course, this court cannot insure that a rule of sequestered voir dire in capital cases will alleviate all the untoward effects of the current procedures. Unless a juror is able to understand and respond with certainty to the *Witherspoon* questions, the juror may be subjected at the sequestered proceeding to considerable voir dire on his or her attitude toward capital punishment. It is unknown at this point whether such personal voir dire would entail the same dangers of inducing bias as do the current procedures for voir dire.

Nonetheless, sequestered voir dire will minimize each juror's exposure to the death-qualifying voir dire of others. It will thereby minimize the deleterious effects of such exposure. Given the frailty of human institutions and the enormity of the jury's decision to take or spare a life, trial courts must be especially vigilant to safeguard the neutrality, diversity and integrity of the jury to which society has entrusted the ultimate responsibility for life or death.

---

ably suggests." (*People* v. *Williams* (1969) 71 Cal.2d 614, 633-634 [79 Cal.Rptr. 65, 456 P.2d 633].)

[137]The rule of sequestration announced today does not require a sequestered voir dire when venirepersons in capital cases are interrogated about those topics routinely discussed in selecting a jury for any criminal case. For example, the following questions may be asked without sequestering the prospective jurors: Do you know the judge, the lawyers, the defendant, the witnesses, or any of the prospective jurors in this case? Have you served on a jury before, and if so, in what kind of case? Have you or your close friends or relatives ever been employed by a law enforcement agency? Or been the victim of a crime, or a witness to a crime, or testified in a criminal case? When pertinent, questions may also be asked concerning the exposure of prospective jurors to pretrial publicity, and their attitude towards proposed defenses (e.g., insanity, diminished capacity, self-defense, or alibi), potentially controversial circumstances of the case (e.g., the race of the participants, the use of alcohol or drugs, or the presence of sexual activity), or important rules of law bearing on the trial (e.g., the defendant's right not to testify, presumption of innocence, truth beyond a reasonable doubt, or jury unanimity).

However, if any of these questions in a specific case are relevant to the death-qualification of the panel or may tend to identify those prospective jurors whose views on capital punishment render them ineligible, then those particular questions should be answered individually and in sequestration. It is the duty of trial counsel to alert the court in advance of voir dire as to which of those general topics are likely to call forth answers bearing on the death-qualification of the jury.

## VIII

Since petitioner has failed to establish his *Witherspoon* and *Ballew* contentions, the only relief to which he is entitled is to have that portion of the voir dire of each prospective juror, which deals with issues other than those traditionally inquired into at any criminal trial, conducted outside the presence of the other prospective jurors.

Let a peremptory writ of mandate issue, directing the trial court to conduct the voir dire in accordance with the views set forth in part VII hereof. In all other respects, the requested relief is denied.

Tobriner, J., Mosk, J., and Newman, J., concurred.

**RICHARDSON, J.,** Concurring and Dissenting.—I concur in that portion of the judgment which denies petitioner's motion to limit the exclusion of prospective jurors at the guilt phase. None of the various surveys and studies relied upon by petitioner has satisfactorily demonstrated that the exclusion from the guilt phase of jurors unable to impose the death penalty has resulted in a jury adjudicating guilt which is unrepresentative of the community or unduly biased in favor of conviction. (See *People* v. *Rhinehart* (1973) 9 Cal.3d 139, 155 [107 Cal. Rptr. 34, 507 P.2d 642]; *People* v. *Murphy* (1972) 8 Cal.3d 349, 368 [105 Cal.Rptr. 138, 503 P.2d 594]; *People* v. *Sirhan* (1972) 7 Cal.3d 710, 747-749 [102 Cal.Rptr. 385, 497 P.2d 1121]; *People* v. *Brawley* (1969) 1 Cal.3d 277, 297 [82 Cal.Rptr. 161, 461 P.2d 361]; *People* v. *Ketchel* (1969) 71 Cal.2d 635, 644 [79 Cal.Rptr. 92, 456 P.2d 660]; *In re Arguello* (1969) 71 Cal.2d 13, 16 [76 Cal.Rptr. 633, 452 P.2d 921]; see also *People* v. *Thornton* (1974) 11 Cal.3d 738, 753 [114 Cal.Rptr. 467, 523 P.2d 267]; *People* v. *Henderson* (1978) 80 Cal.App.3d 584, 591-598 [145 Cal.Rptr. 751].)

In essence, petitioner argues that persons incapable of imposing the death penalty are generally more sympathetic to the criminal defendant, and more hostile to the prosecutor, than other persons qualified to serve as jurors in capital cases. Against petitioner's arguments, we must balance these two factors: (1) the right of the state at the penalty phase to a jury capable of imposing capital punishment (see *Witherspoon* v. *Illinois* (1968) 391 U.S. 510, 520, fn. 18 [20 L.Ed.2d 776, 784, 88 S.Ct. 1770]), and (2) the clear preference of the Legislature that *the same jury* try the issues of guilt and penalty (see Pen. Code, §§ 190.1, 190.3; *People* v. *Thornton, supra,* 11 Cal.3d 738, 753; *People* v. *Hen-*

*derson, supra*, 80 Cal.App.3d 584, 595-597). Weighing these factors together with the inconclusive nature of petitioner's surveys and studies, I conclude that his motion to limit the exclusion of prospective jurors was properly denied, as the majority somewhat reluctantly holds. (*Ante*, p. 67.)

I respectfully dissent, however, from that portion of the judgment which directs the trial court to conduct the death penalty aspects of the voir dire of *each* prospective juror in a capital case outside the presence of the other prospective jurors. This cumbersome procedure, which the majority now mandates pursuant to our "supervisory authority over California criminal procedure" (*ante*, p. 80), will add a very substantial burden to our already heavily engaged courts.

Less than eight years ago, we approved a system of voir dire examination whereby inquiries to prospective jurors were channeled from counsel to the trial court, rather than directly to each individual juror. (*People* v. *Crowe* (1973) 8 Cal.3d 815 [106 Cal.Rptr. 369, 506 P.2d 193].) In *Crowe*, we unequivocally stated that "We approve this method of curtailing the inordinate time consumed in the process of the selection of jurors. Thus appellate cases have referred to 'the waste of valuable court time involved' [citation] and to the 'tedious, irksome and time-wasting prolongation of individual questioning of individual jurors by one side and then the other' [citation]. In *People* v. *Adams* (1971) 21 Cal.App.3d 972, 979 [99 Cal.Rptr. 122], the court observed that 'It is commonplace knowledge that there have been extensive abuses by counsel on *voir dire* examination by engaging in tedious and time-wasting questions, which are seemingly interminable and repetitious and designed in many instances to accomplish purposes other than the legitimate objects of a reasonable *voir dire* examination.'" (8 Cal.3d at p. 825, fn. omitted.)

If the former system of individual questioning of individual jurors *seated together* was "tedious," "time-wasting," "interminable," and "repetitious," it is very clear what the consequences will be of holding a sequestered voir dire of each prospective juror. Before today's decision, the trial judge in a capital case could shortcut the voir dire proceedings considerably by instructing and interrogating the panel *collectively* regarding the death penalty issues. It seems inevitable to me that very much more time and energy henceforth will be required to complete the selection process under the procedure mandated by the majority.

In addition to the further burdens which sequestered voir dire will impose, I seriously question either the wisdom or necessity of such a radical procedure. Frequently, collective voir dire performs a valuable educational function whereby the assembled panel learns the correct disqualification standards and other juror responsibilities by observing the interrogation of the prospective jurors examined in their presence, and the interplay between juror, court and counsel. A prospective juror witnessing the voir dire process as applied to other jurors may find greatly clarified through concrete application the trial judge's necessarily abstract explanation of legal principles. Unfortunately, the majority's proposed new procedure will sacrifice entirely the foregoing educational benefits of collective voir dire insofar as the death issues are concerned.

Nor can I accept the majority's premise that a sequestered voir dire is necessary to protect the defendant's rights in a capital case. If the perhaps extensive voir dire interrogation regarding penalty issues is indeed found to have an undesirable effect upon the jurors' ability to give defendant a fair trial on the guilt issues, any such problem can be alleviated following such interrogation by a careful admonition and instruction regarding defendant's presumption of innocence and the prosecutor's burden of proof. Moreover, I doubt that sequestration will inhibit the tendency of any prospective juror to prejudge the guilt issues, because the supposedly undue emphasis upon penalty issues may still occur.

Finally, it should be noted that the majority's concerns about collective voir dire are based entirely upon a single study (the Haney study) which polled only 67 persons who viewed a simulated, videotaped voir dire undertaken by defense attorneys in the principal roles. I doubt that we should so readily accept the conclusions of a single, small-scale study of this type, when the consequences of doing so require some disruption of our judicial processes. It should also be observed that the Haney study may be as fatally flawed as the *Witherspoon* studies which are criticized by the majority in an earlier portion of its opinion. Although the Haney videotape depicted the disqualification of two jurors who were incapable of imposing the death penalty, the tape contained no similar disqualification of persons who would automatically impose the death penalty in every capital case. As the majority itself acknowledges (*ante*, p. 78, fn. 132]), such a depiction might well have counteracted any tendency on the part of the 67 polled observers to assume

that the trial judge and counsel somehow disapproved of persons with strong views against the death penalty.

For all the foregoing reasons, it seems to me premature to discard a collective voir dire system which has served us rather well in preventing undue delays and in educating prospective jurors regarding their responsibilities under the law.

I would deny the peremptory writ in its entirety.

Clark, J., and Manuel, J., concurred.